79 A.3d 1009

John Timothy NEWELL, et al.

v.

The JOHNS HOPKINS UNIVERSITY.

No. 1861, Sept. Term, 2012.

Court of Special Appeals of Maryland.

Nov. 21, 2013.

218

David W. Brown (Knopf & Brown, on the brief), Rockville, MD, Carter G. Phillips (Richard D. Klingler, Sidley, Austin LLP, on the brief), Washington, DC, for appellant.

James H. Hulme (Leah C. Montesano, Arent Fox LLP, on the brief), Washington, DC, for appellee.

Panel: GRAEFF, NAZARIAN, ARRIE W. DAVIS (Retired, Specially Assigned), JJ.

NAZARIAN, J.

This case has generated a lot of publicity and emotion, and understandably so. Elizabeth Banks was renowned, even revered, for her opposition to development in Montgomery County. Ms. Banks had owned and lived on property known for more than a century as the Belward Farm (the "Farm"), and she undoubtedly had a vision of how The Johns Hopkins University ("Hopkins") could, and would, steward her beloved family land after she and her siblings conveyed the Farm to Hopkins in 1989. Her heirs and surviving family (the "Family") argued in the Circuit Court for Montgomery County, and argue here, that Ms. Banks would not approve Hopkins's current plans to develop the Farm, and Hopkins does not contend otherwise.

But whether Ms. Banks would approve Hopkins's current plans is not the question before us. Instead, this case turns on the terms of a contract and deed that the parties executed nearly twenty-five years ago. The Family does not dispute the validity of the conveyance, or that Hopkins emerged from the transaction with the right to develop the Farm for "agricultural, academic, research and development, delivery of health and medical care and services, or related purposes," or that the proposed " 'mixed-use' research park that 'brings together university, government and private research' " would use the Farm entirely for those allowed purposes. The Family argued below, and argues here, that the scale, density, and lessor/lessee structure of Hopkins's current plans violate the terms of the parties' agreement, and that the circuit court erred in finding their contract not to be ambiguous, and in declining to consider extrinsic evidence of the parties' (particularly Ms. Banks's) intentions and visions when defining Hop-

kins's rights to develop the Farm, and thus in granting summary judgment for Hopkins.

We understand the Family's frustration as they face the increasingly likely prospect that the Farm will transform into a campus that they believe Ms. Banks would never have countenanced. But although the Family may now regret that Ms. Banks and her siblings conveyed the Farm to Hopkins, or at least that they did not negotiate different terms, we agree with the circuit court that the operative contract frames Hopkins's development rights solely and unambiguously in terms of permissible uses. Unlike hindsight, foresight is not 20/20, and whether anyone specifically envisioned the proposed development, the contract permits it. We affirm the judgment of the circuit court.

## I. BACKGROUND

> ... *for agricultural, academic, research and development, delivery of health and medical care and services, or related purposes only* ...

According to Hopkins, the case boils down entirely to these eighteen words, which appear in Paragraph 13 of the Amended and Restated Contract of Sale (the "use restriction clause") and define the uses to which Hopkins agreed, as a condition of receiving the property on generous terms, to limit its future development of the Farm. The story is more complicated than that, of course. Although there is no dispute about the threshold validity of the conveyance, the Family reads the governing documents to limit Hopkins in other ways, and contends that the terms of those documents are ambiguous and must be augmented with extrinsic evidence. We ultimately agree with the circuit court's decision that the language of the contract is unambiguous, but the broader context is important to understanding why.[1]

---

1. On this review of the trial court's grant of a summary judgment motion, we view the facts in the light most favorable to the Family as the non-moving party in the court below. *Long Green Valley Ass'n. v. Bellevale Farms, Inc.*, 432 Md. 292, 310–311, 68 A.3d 843 (2013).

Ms. Banks was the latest caretaker of the Farm, a 138–acre property in Montgomery County that had been in her family for over 100 years. Although she was the only resident of the property, she co-owned it (she held more than two-thirds) with her sister and brother and was the lead decision-maker about its use and ultimate disposition. By the 1980s, properties surrounding the Farm had been developed in ways Ms. Banks disliked. Not only did she make no secret of her opposition to Montgomery County's efforts to develop that part of the County, she actively and successfully rebuffed[2] numerous efforts to develop the Farm itself:

> For 30 years, I have had to protect my farm from federal government installations, state and county highways, all brought on [by] planners who want to rearrange everything every few years, never giving me a rest. Developers and others have tried to buy my land for housing and office buildings. With the help of the Good Lord and many, many true friends and the community, I have been able to keep my land mostly intact and continue farming. It has not been easy. [¶] I want the land to stand for something important for future generations.

According to her nephew Timothy Newell (the lead plaintiff in this litigation), Ms. Banks rejected offers from the County to develop a research park on the Farm no fewer than three times, and stiff-armed other efforts to buy and develop the property.

In the early 1980s, the County imposed assessments to pay for widening roads, including those surrounding the Farm. The County's assessment to Ms. Banks totaled approximately $1.5 million, and she could not afford to pay it. As a result, Ms. Banks began exploring the possibility of selling the Farm, and she had conversations with several institutions. In 1987, Ms. Banks entered into discussions with Hopkins about a possible sale-and-gift transaction that, among other things,

---

2. The Complaint alleges, among other things, that Ms. Banks "was reported in the local newspapers as having driven off at least one trespassing developer with a shotgun."

would allow her to live on the Farm for the rest of her life in a new house that Hopkins would build. Ms. Banks had had positive experiences with Hopkins throughout her life (the hospital had cared well for her and her mother and she was close to former United States Senator George Radcliffe, a Hopkins alumnus), and she saw the donation as a way to ensure that the Farm did not become a commercial or residential development—to her, evidently, the worst possible outcome.

The parties executed a Contract of Sale on August 22, 1988, then restated and amended the contract in an Amended and Restated Contract of Sale they signed on December 10, 1988.[3] The Contract lists Hopkins as the Buyer and Ms. Banks and her sister and brother as the Sellers. In broad strokes, Hopkins agreed to pay the Sellers $5 million in cash—$3 million at settlement and $2 million on or before the third anniversary of settlement—and to settle in January 1989.[4] The recitals "recognize[d] that the purchase price . . . does not represent the fair market value of the [Farm] (including applicable restrictions on future use)," that "[t]he Sellers

---

3. For simplicity, the term "Contract" in this opinion refers to the Amended and Restated Contract of Sale, since the provisions relating to future uses of the Farm did not change between versions. According to its Recitals, the parties amended the original Contract "for the purpose of clarifying Seller's intent to make a charitable contribution to the Buyer; changing the date of Settlement to calendar year 1989; removing the contingencies from the Contract, and making other changes," none of which bear on the scope or nature of Hopkins's authority to develop the Farm. One contingency related to the timing of Hopkins's obligation to pay: initially, the second payment was contingent on Hopkins securing the necessary zoning to proceed with planned development, but that condition was removed.

4. Although Hopkins expressed gratitude to the Family for this well-under-market sale of prime real estate, discovery in this litigation also revealed that the ink was barely dry on the Contract and Deed when Hopkins started trying to claw back substantial portions of the $5 million—funds one memo called " 'our' money"—through additional gifts. And with some success: Ms. Banks paid $100,000 to fund a memorial fountain and garden on the Farm, made at least one six-figure gift to Hopkins before her death, and was viewed by Hopkins's development department as a "prospect" for a further million-dollar gift.

intend to make a charitable contribution to the Buyer to the extent of the excess of the actual fair market value ... over the recited purchase price...." Ms. Banks was able to claim a significant tax deduction for the donation to Hopkins, the "combined gift value" of which Hopkins placed at $15 million. And Hopkins "paid" consideration beyond the cash payments: it also assumed the $1.6 million in County assessments and built Ms. Banks a small house that she occupied until her death.[5]

In exchange, Hopkins took fee simple title to the Farm, subject to use restrictions defined in the three paragraphs that lie at the heart of this case. *First,* and most significantly, Paragraph 13 of the Contract divided the Farm into two parcels—Parcel A, approximately thirty acres adjacent to the road and Parcel B, approximately ninety-eight acres—and defined Hopkins's rights to use and develop each:

> 13. *Use Restrictions.* For a period of no less than the shorter of (a) fifty (50) years from the date the [Farm] is transferred to the Buyer, or (b) 21 years from the death of the last to survive of the now living grandchildren of each of Roland L. Banks, Jr. and Beulah F. Newell, the Buyer shall not dispose of its fee interest in [Parcel B] ..., and Buyer shall further limit its use of such portion of the Land, if any use thereof is made, *for agricultural, academic, research and development, delivery of health and medical care and services, or related purposes only,* which uses may specifically include but not be limited to development of a research campus in affiliation with one or more divisions of the Buyer. Moreover, during said period of time, the Buyer shall maintain such portion of the Land in a well kept and attractive fashion and shall preserve on such portion of the

---

5. Because a planned widening of one of the bordering roads would lead ultimately to the condemnation of her then-current home on the Farm, Hopkins agreed to apply the proceeds from the County's condemnation of her residence to the cost of building a new house for her. Although the record does not reveal exactly how that part of the deal ultimately was implemented, it appears that Hopkins ended up paying more to build the house than it originally expected.

Land an appropriate wooded and fenced buffer area between [certain designated] portions of the Land.... *Such portion of the land shall be known as the "Belward Campus of the Johns Hopkins University."* The restrictions on Buyer's use of the [Farm] set forth in this paragraph shall be enforced by a covenant to be contained in the deed conveying the [Farm] to Buyer for the benefit of Sellers and their descendants.

As to the portion of the Land consisting of 30 acres more or less[, *i.e.*, Parcel A], there shall be no limitations on the Buyer's use or disposition thereof.

(Emphasis added.) A Deed that mirrored the use restriction clause accompanied the Contract and was duly executed at settlement. *Second,* in Paragraph 14, the parties "underst[ood] and agree[d] that the use of the [Farm] contemplated by the Buyer will require a change in the current zoning classification of the [Farm]," and the Family agreed "to cooperate with and assist" Hopkins "in the prosecution of the application for the zoning change and any appeals...." *And third,* in Paragraph 15, the parties also agreed that to the extent any part of the Farm was sold, proceeds were to be used to create or supplement a scholarship fund in Ms. Banks's name.

The Contract and Deed followed about a year-and-a-half of discussion and negotiation between Hopkins and the Family, from early 1987 through the signing of the original Contract in August 1988. Throughout that time, the Family was represented by counsel and had numerous opportunities to review and have input in its language and substance (such as the elimination of the rezoning contingency). It does not appear, however, that the terms of Paragraphs 13 through 15 were changed over the course of negotiations other than to renumber them between the Contract and the Amended Contract to track other changes. Ms. Banks's sister, Bea Newell, provided specific comments on the draft in June 1988, but the record reflects no other written proposed revisions from the Sellers. And although Mr. Newell recalled that counsel for the Family thought the language of Paragraph 13 "too loose," the lan-

guage was never negotiated or revised: circulated drafts of the Contract contain no marked revisions to it. The Contract also contained an integration clause.

According to the Family, Ms. Banks agreed to convey the Farm, and to make "the enormous financial sacrifice that [the Sellers'] bargain sale of the property entailed," only because she believed that it would become a Hopkins campus. Moreover, the Family maintained that Hopkins "was acutely aware" of Ms. Banks's wish to preserve the Farm, as one of its ranks articulated that "[i]f there is one overriding concern to Ms. Banks it is that development of her property be accomplished so as to leave it relatively open and spacious with attention to the beauty of the environment." And in fact, the paper trail at Hopkins and the recollections of its development personnel reflect an understanding that Ms. Banks was vehement in her wishes not to turn the Farm over to developers. John Dearden, a Hopkins official who worked most closely with Ms. Banks over the course of negotiations, was aware of "the Owners' motivations and intentions" throughout, according to Mr. Newell.

The ensuing dispute arose not because Hopkins reneged on its agreement to maintain the Farm as a "campus," but because the campus Hopkins now plans to build is more dense, less pastoral, and less Hopkins-centric than the campus the Family says that Ms. Banks contemplated. At the outset, though, the parties understood that before *any* of the development contemplated by the Contract could begin, Hopkins would have to have the Farm rezoned (Paragraph 15 acknowledges this). The Farm fell within a part of the County covered by the "Shady Grove Study Area Master Plan" (the "Shady Grove Plan"), a plan the County began considering in early 1990 that described the Farm as "a component of the R & D Village to be developed as a research campus containing R & D uses, 50 university-related residences, and recreational uses." On February 27, 1990, Ms. Banks and Hopkins officials appeared at a hearing on the Shady Grove Plan that, according to Ms. Banks's counsel, marked "the only time that the two parties were together and actually communicated

about what they intended with regard to development of the property after that time." A statement read at the hearing by then-Hopkins President Steven Muller described the "major Hopkins research center" that would serve as the "keystone of the western upper campus quadrangle" on Parcel B. Ms. Banks testified as well, opening with the paragraph (quoted above) about how she thwarted efforts to develop the Farm over the preceding thirty years, then explaining her preference that the Farm become a university campus rather than a housing development:

> I want the land to stand for something important for future generations. I do not know whether I can say this or not. I am so proud and grateful that I was able to entrust my farm and its future to a great institution like Johns Hopkins.
>
> * * *
>
> Hopkins has prepared a plan for future use for the farm as a university research campus. And this is the thing that I am so opposed to—I cannot believe that the County is proposing to put housing, 200 to 500 units, on the farm, knowing full well that I hate housing developments and everything a developer stands for.
>
> I have not had the opportunity to travel very often in my life, but I have never seen housing projects on university campuses. You may not know that Montgomery County Government wanted the farm, even giving me a contract, never mentioning a housing project. It stated I could continue farming and live the rest of my life on the farm. The county would develop, in time, the farm like the Life Science Project.
>
> I would appreciate it very much if you would allow Johns Hopkins to carry out their plans so I can see it in my lifetime, some of the things I have worked for all of my life. I think my family and I deserve that much from Montgomery County. Thank you. I am sorry.

The Shady Grove Plan was approved, including the zoning changes Hopkins and the Family supported, in July 1990.

Progress slowed after that. Hopkins ultimately received approval in 1997 for preliminary development; the later 1997 master plan, which we describe below, called for a "conventional suburban office park model with sprawling, low-density auto-dependent development, vast amounts of surface parking lots, and few community amenities"; the tallest buildings on Parcel B would be 50 feet (four stories) high, according to an expert who prepared a report on behalf of the Family. But these plans never materialized, and development was delayed further.

Also in 1997, Hopkins transferred Parcel A to the County—not as a sale but as a transfer in exchange for the County's agreement to develop infrastructure at the site and to share with Hopkins any income generated from the sale of lots on Parcel A. It was at this point, at least according to Mr. Newell, that Ms. Banks began to wonder if her selection of Hopkins as the Farm's guardian was the correct choice: "Subsequent to the transfer of Parcel A to the County, [Ms. Banks] told me she had no idea that [Hopkins] would transfer Parcel A to the County. She said this completely shook her confidence in the deal, and, as expressed to me, she rapidly started regretting her decision after that." Indeed, the Family characterizes the transfer in its brief as "[t]he first *clear breach* of the Contract and Deed" (emphasis added), although the record does not reveal that Ms. Banks ever took any action or sought to have the transfer undone.

The parties agree that the 1997 rezoning would have limited Hopkins to a "campus" of the type allegedly contemplated by Ms. Banks (albeit, as a Hopkins official testified at the February 1990 hearing, a "major Hopkins research center"). But the *now*-current Master Plan approved and adopted by the Montgomery County Planning Department in June 2010 (entitled the Great Seneca Science Corridor Master Plan, or "the Great Seneca Plan") rezoned the Farm to allow a "revised LSC [Life Sciences Center] Zone to allow higher densities." Along with higher-density buildings, the Great Seneca Plan created "opportunities for an extensive open space system," and recommended an *increase in* "the historic farmstead's

environmental setting," nearly doubling the size of the "environmental setting" portion of the Farm. The Great Seneca Plan also provided that development should be "sensitive to the historic resource" by concentrating taller buildings (up to 150 feet tall) in the center of the development and tapering them toward the edges, and it provided for close to 50 acres of open space.

The brewing conflict between Hopkins and Ms. Banks came to a head when Hopkins sought approval for the further rezoning the Great Seneca Plan contemplated. The Family now charges that Hopkins "influenced the County to rezone [the Farm] under a newly-created zone, which permitted much higher-density development than previously." And whatever the language of the Contract, the Family alleges that Ms. Banks and Hopkins did not see eye-to-eye on the basic concept of the "campus":

- By including the term "campus" in Paragraph 13, Ms. Banks "envisioned a 'campus' as the almost idyllic site of an institution of higher learning; accordingly, [Hopkins's] use of [the property] would protect it from heavy commercial development."

- Ms. Banks believed Hopkins "would maintain at least the bulk of the Farm as an open, green space, just as she had fought to keep it throughout her life," and evidently with the understanding that the property would develop along the lines of Hopkins's Homewood Campus in Baltimore (or as Ms. Banks's niece, Karen Newell, put it, akin to the University of Virginia's "Jeffersonian brick campus")—importantly, though, in keeping with Ms. Banks's vision this campus "would be solely operated and in the name of Johns Hopkins."

- Ms. Banks understood that this idyllic campus would operate only under the auspices of Hopkins.

On November 10, 2011, the Family filed suit against Hopkins in the Circuit Court for Montgomery County, seeking a declaratory judgment precluding Hopkins from implementing the amended plan and an injunction prohibiting Hopkins "from

any action that would impair the [Family's] rights under the Contract and the Deed." Hopkins filed a Motion to Dismiss or for Summary Judgment on December 19, 2011 (the "Motion to Dismiss"), in which Hopkins argued that it was entitled to summary judgment because the absence in the Contract of scale, height, or density parameters or restrictions on Hopkins's right to lease Parcel B left it free to develop the Farm, consistent with zoning laws, for the uses Paragraph 13 allowed.[6] Hopkins argued that there were no disputed material facts, and that the only "facts" were found in the language in the Deed itself. According to Hopkins, the restrictions in Paragraph 13 of the Contract were "not ambiguous and should be enforced according to the language appearing within the four corners of the document"; and because the resolution of these two issues did not depend on any subsequent approval from the County, Hopkins was entitled to summary judgment. Differently put, in Hopkins's view, the plain language of the Contract precluded consideration of anything other than *that language,* which in turn did not restrict Hopkins from building taller buildings or creating a more dense campus or leasing space to others. Hopkins sought a declaratory judgment to that effect.

After a hearing, the circuit court issued a written opinion on March 9, 2012 that denied the Motion to Dismiss. The circuit court found that "reasonable minds could differ" about the meaning of the use restriction. The court explained that certain phrases in the Contract gave rise to ambiguity "[a]t this early stage in litigation," and that the meaning of the phrases at issue need not be decided "at this juncture." The court also pointed out that the lack of restrictions on Parcel A suggested "that the parties *may* have intended restrictions on Parcel B that went to the overall scope of development and not just the uses spelled out in the Contract," and that the requirement that Parcel B be known as the "Belward Campus

---

**6.** Hopkins also argued in that motion that the lawsuit was not yet ripe. The circuit court disagreed. Hopkins does not challenge that decision on appeal, so we need not address it further. *See* Maryland Rule 8–131(a).

of the Johns Hopkins University" similarly raised a question as to the parties' agreement. The court concluded that it was too soon to make any conclusive determination: "The contract language lacks the precision necessary to make the determination [Hopkins] requests at this stage in the litigation, when these elements of the Deed and Contract are read in their entirety and inferences made in the light most favorable to the non-moving party." And the court reached the same conclusion with respect to the leasing issue, concluding that "a reasonable person could find that the language restricting disposition *may* contain limitations on [Hopkins's] ability to create leases on" the Farm.

The parties then engaged in discovery, including depositions of the Family and Mr. Dearden and other Hopkins officials, production of the various County plans that had evolved over the years, and transcripts of zoning hearings. On September 24, 2012, Hopkins filed a renewed Motion for Summary Judgment that maintained its original position, and the Family filed a Motion for Summary Judgment arguing the opposite—*i.e.*, that there was no ambiguity in the Contract because, by its terms, it specifically *prohibited* Hopkins's proposed development.

The circuit court held a lengthy hearing on October 26, 2012, and granted summary judgment to Hopkins, in addition to finding that Hopkins was entitled to a declaratory judgment that it could lease the property and was not restricted in the scale or density of development. The court grounded its ruling on a finding that the language of Paragraph 13 was unambiguous:

> I conclude that the transaction at issue is both a sale and a gift, but largely was a sale with substantial monetary consideration flowing from [Hopkins] to the grantors.
>
> As a consequence, I believe that the pertinent analysis that I must follow is set forth in cases such as [*City of Bowie v. MIE, Props., Inc.*, 398 Md. 657, 922 A.2d 509 (2007) ], and the much discussed [case of *Lowden v. Bosley*, 395 Md. 58, 909 A.2d 261 (2006) ]. I have compared the

language of the restrictive covenant in this case to the restrictive covenant in *Lowden,* and, interestingly, [to] the restrictive covenant in *City of Bowie.* While in *City of Bowie* there were multiple restrictive covenants, one of them was similar, albeit not identical, to some of the language in this case.

In *City of Bowie,* the first restriction was buildings for science, technology, research and related issues. That is fairly close to the language in both the amended contract and the deed before me. And in the *City of Bowie* case, the Court of Appeals held that such language was unambiguous.

We've discussed *Lowden* already, where the restrictive language was "a lot shall be used for single-family residential purposes only." Although the Circuit Court's judgment in that case was affirmed, the Court of Appeals was of the view that, "Unlike the Circuit Court we find no ambiguity with respect to this issue and, consequently, we have no occasion to consider the extrinsic evidence relating to intent."

So my [principal] holding is that the language of the restrictive covenant contained both in the amended contract and in the deed is unambiguous. It is clear and plain. It was a bargain for exchange.

The circuit court made several other determinations relevant to the summary judgment motion:

● The court interpreted Paragraph 14 as a "seller cooperation clause, not a limitation either on the use of the property or on the number of zoning applications that the owner in fee simple absolute could make";

● The court concluded that the naming requirement required nothing more and "does not form any part of the restrictive covenant language contained in either the amended contract or the deed"; and

● The court concluded that the fee simple interest "had no impact on the nature of the restriction of the property."

The court held alternatively, in the event a reviewing court found the language of Paragraph 13 to be ambiguous, that Hopkins still was entitled to summary judgment. It applied the "principle of reasonable construction" of *Lowden* and *City of Bowie* to conclude that any ambiguity did not tip the balance in the Family's favor:

> [A]ny ambiguity has not been resolved by [any extrinsic] evidence put forth by the plaintiffs.... This, in my judgment, then triggers the general rule in favor of the unrestricted use of the property. In that event, as discussed in the *City of Bowie* case, the covenant should be read to promote the free alienability and use of land. I stress that's an independent holding, only in the event that it is concluded that the language is ambiguous.

The circuit court also issued a written order declaring Hopkins free from the restrictions the Family sought to impose:

> [T]he Amended Contract and Deed do not impose restrictions on [Hopkins] related to the scale or density of its development of Parcel B, as that parcel is defined in the Amended Contract and Deed, and ... the only development and use restrictions applicable to [Hopkins] are those set forth in [Paragraph 13] and no other; and it is further
>
> DECLARED that the Amended Contract and Deed provide that: "For a period of no less than the shorter of (a) fifty (50) years from the date the Property is transferred to [Hopkins], or (b) 21 years from the death of the last to survive of the [now] living grandchildren of each of Roland L. Banks, Jr. and Beulah F. Newell, [Hopkins] shall not dispose of its fee interest in that portion of the Land consisting of [Parcel B]"; and it is further
>
> DECLARED that the Amended Contract and the Deed do not restrict [Hopkins] from executing leases with third parties with respect to Parcel B, as that parcel is defined in the Amended Contract and Deed, and that the only transfer restriction applicable to [Hopkins] is that set forth in the preceding paragraph, which is limited in time as set forth

and limited in scope in that it only applies to transfers of the fee interest in Parcel B.

The Family filed a timely appeal.

## II. DISCUSSION

Although the parties list numerous issues in their briefs,[7] this case presents a fairly simple question of contract interpretation that the circuit court asked in the simplest, and correct,

---

7. The Family presents the following issues on appeal:

 I. Whether the Circuit Court erred by predicating its analysis on a finding that the [Family's] conveyance of [the property to Hopkins] was "largely ... a sale," where the farm's value was at least three times the purchase price and the parties explicitly recognized in their contract that the difference between the purchase price and [the property's] fair market value constituted a "gift" to [Hopkins]?

 II. Whether the Circuit Court erred by concluding that the contract and deed unambiguously permitted [Hopkins] to develop Parcel B as a high-density, commercial research park and to lease Parcel B to third parties where the contract and deed explicitly provide that any use of Parcel B must be by [Hopkins] and the text of the contract and deed, together with the facts and circumstances of the conveyance, indicate that the parties intended to subject Parcel B to only light development?

 III. Whether the Circuit Court erred by failing to give effect to the mutually-agreed intent of the parties, as evidenced by communications between the parties and their conduct both before and after the conveyance, that Parcel B was donated to function as a low-density "campus" to be used by [Hopkins], not a high-density commercial research park to be leased to third parties?

 IV. Whether, even if the contract and deed did unambiguously permit [Hopkins's] contemplated development and use, the Court nevertheless erred by failing to consider extrinsic evidence of the grantors' charitable intent?

 Hopkins sees the issues differently:

 1. Did the circuit court properly rule that the Restrictive Covenant is not ambiguous, does not restrict [Hopkins] from developing a research and development center on Parcel B, does not restrict the scale, height, and density of the development on Parcel B, and does not prohibit [Hopkins] from leasing to others?

 2. Did the circuit court properly rule, in the alternative, that [the Family] failed to carry [its] burden of proof, that the extrinsic evidence did not "clearly resolve" any ambiguity in the Restrictive Covenant in favor of [the Family], and, thus, that the law promoting the free, unrestricted use of land prevails?

 3. Did the circuit court properly consider extrinsic evidence of the intent of all parties to the Contract and Deed, as opposed to solely the intent of the Sellers?

way: "If the words of the restrictive covenant are not ambiguous . . . doesn't that end it?" There is no dispute (and the Family conceded at argument) that Hopkins seeks only to pursue "agricultural, academic, research and development, delivery of health and medical care and services, or related purposes" on the Farm—the dispute lies in whether the Contract and Deed limit the scale and density of development on the Farm (independent of any limits the County's zoning laws impose) and whether those documents require Hopkins *qua* Hopkins to own and operate the buildings and programs on the campus.

The Family goes back and forth on whether the limits it asks us to recognize appear unambiguously in the Contract and Deed or emerge from extrinsic evidence we could use to inform our interpretation of ambiguous terms. On the one hand, in its brief, the Family argued that the Contract and Deed unambiguously prevents Hopkins from leasing any part of Parcel B or undertaking high-density development. On the other, at oral argument, the Family pressed the same conclusions by arguing that the Contract is ambiguous, and that language in Paragraph 13 requiring the *Buyer* to *use* the Farm for a *campus* prevents Hopkins from leasing any part of Parcel B or building a high-density development. Hopkins argued all along that there is no ambiguity and that the Contract only limits the uses it can make of the Farm. Hopkins also argues that the available extrinsic evidence does not clarify any ambiguities.

We review the circuit court's order granting summary judgment "by considering the record in the light most favorable to the non-moving party." *Long Green Valley Ass'n v. Bellevale Farms, Inc.*, 432 Md. 292, 311, 68 A.3d 843 (2013) (citations omitted); Md. Rule 2–501(f) (permitting a trial court to grant a motion for summary judgment "in favor of or against the moving party if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law"). We review *de novo* any questions of law, *Long Green Valley*, 432 Md. at 311, 68 A.3d 843 as well as the

trial court's decision to issue a declaratory judgment. *Atkinson v. Anne Arundel County,* 428 Md. 723, 741, 53 A.3d 1184 (2012). We review for clear error any factual findings the circuit court made with regard to ambiguities in the Contract and the intent of the parties at the time they entered it. *City of Bowie v. MIE, Props., Inc.,* 398 Md. 657, 683 & n. 16, 922 A.2d 509 (2007). And because we agree with the circuit court that the operative provisions of this Contract are not ambiguous, the inquiry ends there—not because we find that Hopkins's vision for the Farm necessarily is true to the Family's (we make no such finding), but because the unambiguous words the parties used to memorialize their agreement limits Hopkins's future development of the Farm only in terms of how it uses the Farm, not in terms of scale or density or ownership structure.

### A. Maryland Law Looks To Evidence Extrinsic To The Contract When The Language Is Ambiguous.

 We start with the language of the Contract and Deed, which we examine first for ambiguity. *SDC 214, LLC v. London Towne Prop. Owners Ass'n,* 395 Md. 424, 434–36, 910 A.2d 1064 (2006). The language of a contract is "ambiguous" under the "law of the objective interpretation of contracts" if, "when read by a reasonably prudent person, it is susceptible of more than one meaning." *Calomiris v. Woods,* 353 Md. 425, 435–36, 727 A.2d 358 (1999) (citations omitted). We look to extrinsic, or outside, evidence when the subject language presents an ambiguity:

> Extrinsic evidence is only utilized when the intent of the parties and the purpose of a restrictive covenant cannot be divined from the actual language of the covenant in question, necessitating a reasonable interpretation of the language in light of the circumstances surrounding its adoption.

*City of Bowie v. MIE Properties,* 398 Md. 657, 681, 922 A.2d 509 (citing *SDC 214, LLC,* 395 Md. 424, 434–36, 910 A.2d 1064 (2006)); *see also Miller v. Bay City Prop. Owners Ass'n,* 393 Md. 620, 634–37, 903 A.2d 938 (2006) (reviewing but not

applying the reasonable construction rule, ultimately construing the words of the covenant at issue as "clear and unambiguous").[8] As the Court of Appeals explained recently, we should keep the analysis simple when the language permits: "Where the instrument includes clear and unambiguous language of the parties' intent, we will not sail into less charted waters to interpret 'what the parties thought that the agreement meant or intended it to mean.'" *Long Green Valley*, 432 Md. at 314, 68 A.3d 843 (quoting *Garfink v. Cloisters at Charles, Inc.*, 392 Md. 374, 393, 897 A.2d 206 (2006)).

■ This rule ensures certainty in contracting. If a contract's language is unambiguous, it is simple enough to "give effect to that language 'unless prevented from doing so by public policy or some established principle of law.'" *SDC 214, LLC*, 395 Md. at 434, 910 A.2d 1064 (quoting *Miller*, 393 Md. at 637, 903 A.2d 938). This is all the more true in the context of restrictive covenants, which "are meant to be enforced as written," *Chestnut Real Estate P'ship v. Huber*, 148 Md.App. 190, 202, 811 A.2d 389 (2002), and where the Statute of Frauds specifically requires that a contract be in writing. *See Pumphrey v. Kehoe*, 261 Md. 496, 504, 276 A.2d 194 (1971) (mandating "rigid enforcement" of the parol evidence rule in the sale of land, where the Statute of Frauds requires written contract); *Markoff v. Kreiner*, 180 Md. 150, 158, 23 A.2d 19 (1941) ("When a contract is required by the Statute of Frauds to be in writing, an agreement modifying its provisions cannot be proved by parol."); *see also* Md. Code (1974, 2010 Repl. Vol.), § 5–103 of the Real Property Article.

■ This does not mean that we ignore the remaining language in the contract. *Lowden v. Bosley*, 395 Md. 58, 66, 909 A.2d 261 (2006). Although we limit our initial review to Paragraph 13, we can look to the rest of the Contract (not

---

8. This case does not present a need for extrinsic evidence to explain terms that have a specific meaning in a particular business or trade. *See, e.g., 8621 Ltd. P'ship v. LDG, Inc.*, 169 Md.App. 214, 231, 900 A.2d 259 (2006); Md. Code (1975, 2013 Repl. Vol.), § 2–202 of the Commercial Law Article.

beyond) to determine at the outset whether an ambiguity exists. *Id.; see also Weichert Co. of Md., Inc. v. Faust,* 419 Md. 306, 317, 19 A.3d 393 (2011). Importantly, though, this does not mean a party can find ambiguity *anywhere* in a contract and render the entire document suspect. As the Court of Appeals explained in *Calomiris,* a party may not allege ambiguity in one part of an instrument to permit admission of extrinsic evidence with respect to another part of the contract where there is no nexus between the two. 353 Md. at 441, 727 A.2d 358. Instead, "[t]he extrinsic evidence admitted must help interpret the ambiguous language and not be used to contradict other, unambiguous language in the contract." *Id.; see also Dumbarton Improvement Ass'n v. Druid Ridge Cemetery Co.,* 434 Md. 37, 57, 73 A.3d 224 (2013) ("[A] covenant need not address every conceivable issue or potential outcome to avoid being ambiguous; it need only provide a clear answer for the matter in dispute.").

## B. The Operative Language Is Not Ambiguous And Does Not Limit The Scale Or Density Of The Development, Nor Preclude Leasing.

The language at the heart of this case—the eighteen words, as it were—appears in Paragraph 13 of the Contract, which states in relevant part that Hopkins "shall limit its use [of Parcel B to] . . . agricultural, academic, research and development, delivery of health and medical care and services, or related purposes only." On its face, this language is both limiting and broad: it limits Hopkins *only* to the listed uses (there is no "including but not limited to" or other catch-all expander), but also allows Hopkins to use the property for "related purposes." The last phrase also indicates that the list is meant to be disjunctive or alternative, although nothing in this list suggests that the parties intended to single out or elevate any one of these purposes above the others. *See Long Green Valley,* 432 Md. at 319, 68 A.3d 843 (declining to "rush too quickly past the express terms" of the instrument at issue to discern the parties' intent).

Again, the Family does not contend that Hopkins seeks or intends to stray beyond these approved uses. Instead, the Family tries to engraft onto the Contract further limitations on how or through whom Hopkins may accomplish the listed purposes. *First*, the Family argues that the word "its" (which relates back to "Buyer," or Hopkins) in the phrase "limit its use" indicates that only Hopkins may own or occupy the property, and thus forbids Hopkins from leasing any portion of the developed property to third parties. We do not read the language to stretch that far. We cannot see why Hopkins leasing the property to others to accomplish one or more of the listed purposes does not qualify as a use by Hopkins, and they read *Keseling v. Mayor and City Council of Baltimore*, 220 Md. 263, 151 A.2d 726 (1959), too broadly to the contrary. In *Keseling*, the landlord who leased residential property to lodgers violated a zoning ordinance forbidding "business" uses of the property—unlike here, then, the landlord used the property in a prohibited manner. *Id.* at 267–68, 151 A.2d 726. Here, the Farm will be used for an indisputably approved purpose, and nothing in Paragraph 13 (or elsewhere in the Contract or Deed) restricts how or through whom the Buyer, Hopkins, can carry out those purposes.[9]

*Lowden*, 395 Md. 58, 909 A.2d 261, presents a similar scenario and a more helpful analogy. In that case, the owners of a vacation home filed suit against a neighboring homeowner to prevent short-term rental within a subdivision. The Court of Appeals affirmed the judgment for the homeowners, but unlike the circuit court, held that the language of the covenant at issue was plain and did not require extrinsic evidence. There, as here, the covenant limiting use to residential purposes did not "on its face . . . prohibit the short-term rental of

9. The record affords some reason to believe that Hopkins's plans weren't news to Ms. Banks. In the summary judgment hearing, counsel for the Family acknowledged that at the 1990 zoning hearing, Hopkins revealed its intention to lease Parcel B, and that Ms. Banks was aware of that position. As the Family's counsel put it, "[w]e are stuck with [Hopkins's] interpretation of the contract as announced to her without objection two years later. That's the problem."

a defendant's home to a single family which resides in the home," *id.* at 67, 909 A.2d 261, which is to say that the use of the property was not limited by restrictions on who could use the property in an approved manner or how (because there, the inclusion of "residential use" did not serve to prohibit "rental use"), *see id.* at 69, 909 A.2d 261 ("The owners' receipt of rental income in no way detracts from the *use* of the properties as *residences* by the tenants.").

*Second,* the Family argues that the use of the term "campus" in Paragraph 13—in the language following the list of uses stating that the "uses may specifically include but not be limited to development of a research campus in affiliation with one or more divisions of [Hopkins]"—imposes scale and density restrictions on Hopkins's development of the Farm independent of limits imposed by Montgomery County's zoning laws. This argument reads too much into the word "campus," a term the Contract does not otherwise define. It appears from discovery that Ms. Banks, and other members of the Family too, imagined a campus more bucolic than the one Hopkins intends to build (although in 1990, when Ms. Banks and Hopkins testified together in support of the first zoning change, she apparently was at peace with a "major Hopkins research center"). But a campus with more or taller buildings is no less a campus, particularly if (as here) the agreed purposes of the campus would indisputably be carried out in those buildings.

This analysis is not altered by the language in Paragraph 13 requiring Hopkins to name Parcel B as the "Belward Campus of the Johns Hopkins University," a requirement that Hopkins has met. There is nothing inherent in the name that limits the manner in which Hopkins carries out the campus's mission on the land. *See MIE Props.,* 398 Md. at 683, 922 A.2d 509 (noting that a naming requirement to include the University of Maryland in the title of a Science and Technology Center did not serve to require its participation in the development of the research park itself). Put another way, the Belward Campus is still a campus, whatever the size or density of the buildings,

so long as Hopkins has devoted the space to the agreed purposes.

*Third,* the Family argues that the use in Paragraph 14 of singular articles to describe changes to the Farm's zoning classification [10] limits Hopkins to one and only one change in the Farm's zoning, a chip it redeemed in 1997. But although it is true that the Gaithersburg Valley Master Plan in place at the time of contracting, and the corresponding zoning change, mandated lower-density development than the Great Seneca Plan does, the evolution of the County's master plans over time reveals the ultimate flaw in the Family's argument. Perhaps nobody anticipated that the County would enact a new master plan before development began on the Farm in earnest, but in fact the County *did* enact a new master plan, as counties and municipalities often do. That master plan contemplated a different zoning classification for the Farm that is consistent with the allowed purposes—and, at least on its face, claims to strike a better balance between development objectives and environmental preservation. The Family need not agree that the Great Seneca Plan is in fact better, but what if it were "better" in the Family's way of thinking— would the mere presence of singular articles in Paragraph 14 reflexively preclude Hopkins from improving its stewardship of the Farm in a way the Family approved? Although changes in articles can be important, *see, e.g., Butler v. State,* 214 Md.App. 635, 907–08, 78 A.3d 887 (2013) (reading the meaning of a particular statute to have broadened, based on the replacement of the word "the" with "a" as a modifier), we disagree that the language of this paragraph—the overriding

---

10. Paragraph 14 contains two references to zoning changes:

 Buyer and Sellers understand and agree that the use of the Property contemplated by the Buyer will require *a change* in the current zoning classification of the Property. The Sellers agree to cooperate with and assist the Buyer, including joining in applications or plats and participating in administrative or judicial proceedings, as reasonably requested by Buyer and at Buyer's expense, in the prosecution of *the application for the zoning change* and any appeals taken in accordance with this paragraph.

 (Emphases added.)

substantive purpose of which is to ensure the Family's cooperation with Hopkins in connection with at least the first necessary zoning change—locks Hopkins forever into the 1997 version of Montgomery County's zoning laws, particularly since the Contract contains no other scale or density limitations on development.

At oral argument, we asked counsel for Hopkins whether there were any limits on its ability to develop the Farm so long as it used the property for a permitted purpose, and counsel replied that there were not. Which is not quite true: at the end of the day, zoning law stands as an independent limitation on Hopkins's ability to develop the Farm. The restrictive covenants in the Contract and Deed could, in theory, limit Hopkins further, but not unless the covenants actually did so, which these do not.

## C. Extrinsic Evidence Would Not Change The Outcome.

Although the lack of ambiguity eliminates the need to address the extrinsic evidence on which the Family relies for its interpretation of Paragraph 13, a few points bear a brief discussion that confirms, in our mind, the correctness of our analysis. *First,* whether Ms. Banks specifically "acquiesced" in the zoning process when she attended the 1990 zoning hearing, the fact that she came to disapprove of Hopkins's evolving plans for the Farm does not create a right in the Family to insert new limits into the Contract now. A bad deal does not mean a void deal, and whatever issues the Family has with Hopkins's long-term management of the Farm, it cannot now hold Hopkins accountable for parameters that Ms. Banks may (or may not) have had in mind that went unexpressed in the Contract. It may be that the time lag between the Contract's execution and the later political environment for development led Hopkins to rethink its plans for the Farm. But neither the lapse in time nor changed circumstances alters the scope of the limitations to which the parties actually agreed or, put another way, the terms of the covenants that actually bind them. *See Dumbarton Improvement Ass'n,* 434

Md. at 61–62, 73 A.3d 224 (although the meaning of the language in a 1913 Deed was best addressed by the trial court, the analysis was not necessary where the covenant was clear and unambiguous in the first instance, even nearly a century later). The Sellers chose to execute the Contract as currently worded, and as the Court of Appeals noted (twice) in *Dumbarton*, a reviewing court "will 'not invalidate a plainly written covenant to save a party from what may prove to be a poor business decision.'" *Id.* at 61, 67, 73 A.3d 224 (quoting *MIE Props.*, 398 Md. at 683, 922 A.2d 509).

*Second,* Mr. Newell's answer to one interrogatory suggests that the Family views the spirit of the Contract differently than Hopkins does:

> [Hopkins] represented that the campus would be occupied and developed by [Hopkins] for [Hopkins] as a university campus, including all the things that would go along with that. This was done in an atmosphere of trust and confidence where it wasn't thought necessary to spell out "do's" and "don't's" in extensive detail.

The Family no doubt believes it has been genuinely aggrieved by the way that Hopkins seeks to implement the Contract, and we do not mean for an instant to diminish its anger or disappointment if Hopkins's current vision for the Farm deviates from what Ms. Banks or other Family members thought would happen. But again, our task is to examine the agreement the parties did sign, not the agreement that one or the other now wishes they had negotiated instead. And although it may seem cold to hang our decision on rules of construction, certainty in contracts is important too, especially when the language of the contract is unambiguous:

> A trial court may properly consider the apparent fairness of a given result when contract language is susceptible of two different interpretations, one of which leads to a reasonable result and the other to an unreasonable result.... But where, as here, one interpretation is consistent with the express language of the contract and the other interpretation contradicts that language, and thus the language of the

contract is *not* open to interpretation, the reasonableness of result is an improper consideration for the trial court. *Calomiris,* 353 Md. at 446, 727 A.2d 358.

*Finally,* it makes no difference whether this transaction is characterized as a sale, a gift, or both. The existence (or not) of charitable intent may bear on questions related closely to that intent, such as formation of a charitable trust, *see Long Green Valley,* 432 Md. at 316–17, 68 A.3d 843 or whether and how to save a charitable bequest no longer capable of execution in the construction of a will, *see Gallaudet Univ. v. Nat'l Soc'y of the Daughters of the Am. Revolution,* 117 Md.App. 171, 206, 699 A.2d 531 (1997), but not to the pure contract interpretation question presented here.

**JUDGMENT OF THE CIRCUIT COURT FOR MONT-GOMERY COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**