PULASKI, ADMINISTRATRIX ET AL. *v.* RILAND

[No. 108, October Term, 1951.]

*Decided March 7, 1952.*

The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS and MARKELL, JJ.

*R. Dorsey Watkins,* with whom were, *Watkins, Avirett & Egerton,* on the brief, for appellants.

*J. Mayer Willen,* for appellee.

MARBURY, C. J., delivered the opinion of the Court.

We are asked in this case to construe a post-nuptial agreement entered into between Dr. Chester Riland and his wife, appellee herein, on July 29, 1935. This agreement was as follows:

"This agreement, made this 29th day of July, 1935, by and between Chester Riland, MD, and Nellie H. Riland, husband and wife, witnesseth that, whereas, on account of certain differences between them, the said parties have separated,

and whereas, they have determined to herewith, *settle their property rights,* as well as the right of maintenance and support to which the said Nellie H. Riland is entitled as the wife of the said Chester Riland, MD.

"Now then, it is agreed between them that each of the parties hereto, *waives his and her dower rights against the other,* on condition that until either one shall have obtained a divorce *a vinculo matrimonii* against the other, the said Chester Riland, MD, shall pay to the said Nellie H. Riland, the sum of $25.00 per week for her maintenance and support, beginning the first day of August, 1935, . . ."

(Emphasis supplied.)

Dr. Riland made the $25.00 a week payments (at times under pressure) until his death on March 11, 1950. He left a will which made nominal bequests to his four children by his second wife (the appellee being his third), and the balance of his estate he left in trust to his illegitimate son, Pulaski Riland, with a conditional remainder to the child's mother, Martha Pulaski. There was a notice of caveat filed by the appellee, and Martha Pulaski and Louis Silberstein were appointed administrators *pendente lite.* There is some question as to the value of the estate. The inventory shows real property of $10,000, and personal property of $7,600. The debts are estimated at $12,000.

The Rilands had never been divorced *a vinculo,* and Mrs. Riland filed a bill of complaint after his death, in the Circuit Court No. 2 of Baltimore City, alleging that Martha Pulaski had obtained possession and control of the great bulk of Dr. Riland's personal estate by the exercise of undue influence. She also alleged concealment by Martha Pulaski, and asked that certain transfers of bank accounts be set aside, and that a disclosure be made of all money and personal property obtained by Martha Pulaski from Dr. Riland. The court was also asked to declare that Mrs. Riland was entitled, as sur-

viving widow, to an undivided one-third share in the real and personal estate of her husband. A separate defense was filed to this last allegation, and, as this question determined the right of the appellee to proceed, it was heard first. The chancellor made a limited finding that, by the execution of the agreement of July 29, 1935, the appellee had not waived all of her interest in the estate of her deceased husband. The case was then heard on its merits and a decree was filed in which it was held that the agreement of July 29 was valid, but that it did not bar the appellee from receiving her statutory and legal share in the real and personal estate of her husband. The other allegations in the bill were not sustained by the court, and the bill of complaint was dismissed as to all transfers of stock and cash from Dr. Riland to Martha Pulaski. Mrs. Riland did not appeal, but Martha Pulaski, individually, and with Louis Silberstein, as administrators *pendente lite,* and Pulaski Riland, did take an appeal, so that the sole question before us is whether the appellee is barred from sharing in her husband's estate.

There is no great dispute about the facts. Dr. Riland divorced his second wife in 1924, and within a month married the appellee who had been his housekeeper for several years. They lived together until 1935, when she left home because of his alleged misconduct. Martha Pulaski went to live with him, and remained with him until his death. She and Dr. Riland had an illegitimate child on August 15, 1934, who was registered as Pulaski Riland Hicks. The Doctor's explanation of this was that he intended to divorce the appellee and marry Martha Pulaski, who was at that time married to a man named Hicks. She finally got a divorce from Hicks, but, although the Doctor tried twice, he failed to get a divorce from the appellee. When Pulaski Riland Hicks became of school age, Dr. Riland had his birth registration changed so as to show that he was the father, and Martha Pulaski the mother, and he registered his name as Pulaski Riland.

At the time of the separation, the Doctor brought Martha Pulaski, then Mrs. Hicks, and her son, to his home. Mrs. Riland left and went down to the Doctor's beach property in Anne Arundel County for three months to see what would result. She finally went to a lawyer to ask about her support. She came up occasionally to see what was going on, and, on one occasion, the Doctor told her that his attorney, Mr. Fluegel, had drawn up an agreement, and if she wanted support, to go down and sign the agreement in Mr. Fluegel's office. Mrs. Riland tried to get her attorney to contact the Doctor, but the Doctor refused to have anything to do with him. She went to Mr. Fluegel's office without the benefit of her own counsel. Mr. Fluegel showed her the agreement he had drawn, and she signed it. The Doctor was not present. She said she read the paper over, but did not know what it was all about, that she asked Mr. Fluegel what "dower" meant, and he said something about that permitting her husband to sell the property. In contradiction to this statement, there was shown a cross-bill which she had filed in one of the Doctor's divorce proceedings in which she averred "that in said settlement agreement she was not allowed any share of her husband's estate".

One of Dr. Riland's children by his second wife, testified that she had a conversation with her father in August, 1935, and that the latter was very much elated over the fact that her stepmother, the appellee, had signed the agreement. She said her father was proud that he had put something over on her and said: "I really did put it over on her that time. She certainly must have been sleeping." Another witness testified that the Doctor had told her that he had made a property settlement to pay his wife $25.00 a week, that she had signed off his property, that he hoped to live to educate his boy properly, and he intended to leave him everything he possessed. Another daughter said that he was sorry he had entered into the agreement because Mrs. Riland would never get a divorce as long as she could get $25.00

a week, and he wanted to marry Martha before he died. He said he wanted to marry Martha Pulaski so that he could give her a name, that Pulaski Riland was going to have a hard time, and he was going to give him his opportunities. He said: "Nellie signed off the house and everything, and when I die, it is over." These declarations by the Doctor are evidence of what he intended, or thought had been accomplished by the agreement, but of course they in no way bind the appellee. The question before us is the true construction of the agreement according to its terms. If they are clear, the courts have no authority to write in something which is not there. It is only when the terms of an agreement admit of ambiguity or doubt, that courts will consider evidence of the situation of the parties, or their different interpretations, in order to resolve the ambiguity. *Hubble v. Somerville*, 187 Md. 418, 428, 50 A. 2d 565. *Insley v. Myers*, 192 Md. 292, 300, 301, 302, 64 A. 2d 126.

The contention of the appellant is that since the recital in the agreement is that the parties "have determined to herewith settle their property rights, as well as the right of maintenance and support", this shows that what the agreement meant was that all property rights have been settled. That is, however, merely a recital, and we must look to the operative part of the agreement to find out what the parties actually did. All that is said as to this is that "each of the parties hereto waives his and her dower rights against the other". On the question of what is dower, the appellants say that this has been construed as equivalent to property rights or interest, and cite *Schnepfe v. Schnepfe*, 124 Md. 330, 92 A. 891, *Hill v. Boland*, 125 Md. 113, 93 A. 395, and *Pearre v. Grossnickle*, 139 Md. 1, 114 A. 725. In these cases, there is some use of the word "dower", as if it meant more than the strict use of the term, but we find nowhere in them any intimation that the word itself, apart from other circumstances, should be treated as meaning anything else than its common law usage.

In one of the latest cases before this court, there was a question whether a wife, under certain circumstances of misconduct, should forfeit both dower and her distributive share of the personal estate. The statutes under consideration were 13 Edward 1, Chapter 34, and the Act of 1809, Chapter 138. This question was left open in the first case: *Schmeizl v. Schmeizl*, 184 Md. 584, 599, 42 A. 2d 106. It was raised, however, in the Orphans' Court of Baltimore City, and, on a second appeal here, *Schmeizl v. Schmeizl*, 186 Md. 371, 374, 46 A. 2d 619, we held that even if the statute of 13 Edward 1 was in force in Maryland, it could not bar the wife of her distributive share of her husband's personal estate, because it applied only to dower, citing as authority for this, *Mack v. Pairo*, 136 Md. 179, 110 A. 198. In *Mack v. Pairo*, Judge Burke cited *Thomas on Coke on Littleton* for the following meaning of the word "dower": "Tenant in dower is, where a man is seised of certain lands or tenements in fee simple, fee tail general, or as heir in special tail, and taketh a wife and dieth; the wife, after the decease of her husband shall be endowed of the third part of such lands and tenements as were her husband's at any time during the coverture; to have and to hold to the same wife in severalty by metes and bounds for terms of her life, whether she hath issue by her husband or no, and of what age soever the wife be, so as she be past the age of nine years at the time of the death of her husband, (for she must be above nine years old at the time of the decease of her husband) otherwise she shall not be endowed."

It is, of course, beyond question that the word "dower" has this distinct and definite meaning in our law. Article 46 of the Code of Public General Laws, by Secs. 2 and 3, gives a widow or surviving husband the same rights in real estate as they would have in personal property, and, by Sec. 4, it is provided that these preceding sections shall not be construed as abolishing the estates known as the dower of a widow, and the dower of a surviving husband, but any party entitled to such rights shall be

presumed to have waived them, and to accept the provisions of the act, unless a written election is filed in the Orphans' Court within six months after the death of the other spouse. Common law dower, therefore, now exists in Maryland, but not as an absolute right. It must be elected, and it is separate and distinct, and directly opposite to the statutory right of inheritance. *Trotter v. Lewis,* 185 Md. 528, 538, 45 A. 2d 329. In the case of *Schnepfe v. Schnepfe, supra,* upon which the appellants rely, there was an ante-nuptial agreement in which the prospective husband agreed to pay a prospective wife, "in lieu of any dower interest" which she would acquire upon her marriage, the sum of $12,000, to be paid her after her husband's death. After her husband died, he left a will in which he did not leave her $12,000, and she filed a bill to have his executor pay her this sum. The lower court passed such a decree and it was affirmed here. There was no question in that case of anything but the $12,000. The court said it was not necessary to determine whether the expression used in the ante-nuptial contract, when taken in connection with the preamble and other parts of the contract, would necessarily limit its effect to "dower" in its strict sense. Appellant says that this statement supports an inference that "dower" might not be used in its strict sense under certain circumstances and conditions, but, conceding this for the purposes of the argument, we find nothing in the preamble of the agreement before us or the circumstances of the case which would lead us to extend the meaning of the definite word used. "Dower" is a word of ordinary legal significance known to all lawyers. The agreement in this case was drawn by the husband's lawyer. It will be presumed that he knew the meaning of the word, and if there were any doubt, it would be construed against the husband, under such circumstances. We do not think, however, there is any doubt. We think the meaning of the word used is plain.

The general rule of construction as to both ante-nuptial and post-nuptial agreements is that they will not bar

the right of a surviving spouse in the estate of the other, unless there is a clear statement to that affect, or a necessary implication. This rule was applied in a case where a husband agreed that his wife should hold her property "free from all rights of the said" husband "with full power to her to convey, assign, or deal with the same as if she were single." When the wife died, the court said that the husband had not given up his rights in her estate. *Hewitt v. Shipley,* 169 Md. 221, 181 A. 345, 346. We must, of necessity, conclude that nothing in the agreement between Dr. Riland and his wife bars her from claiming her statutory right of inheritance to share in her husband's real and personal estate. Therefore, the decree of the lower court will be affirmed.

*Decree affirmed with costs.*