REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2429

September Term, 2012

SIERRA CLUB, ET AL.

v.

DOMINION COVE POINT LNG, L.P.

Meredith,
Kehoe,
Hotten,

JJ.[1]

Opinion by Hotten, J.

Filed: February 28, 2014

[1] Judge Douglas R. M. Nazarian did not participate in the Court's decision to designate this opinion for publication in the Maryland Appellate Reports pursuant to Maryland Rule 8-605.1

The Sierra Club, a non-profit California corporation, and the Sierra Club Maryland Chapter (collectively the "Sierra Club") bring this appeal in response to the circuit court's ruling in a declaratory judgment action filed by Dominion Cove Point LNG, L.P. ("Dominion"). The Sierra Club challenges Dominion's assertion that an agreement between the two restricting the use of Cove Point permits the exportation of natural gas. The Circuit Court for Calvert County found that the agreement was unambiguous and permitted Dominion to expand its operations to include exportation. The Sierra Club appealed and presents one question for our consideration:

> Does the 2005 Agreement between Dominion, Sierra Club and [Maryland Conservation Counsel Inc.] allow Dominion to construct LNG export facilities at the Cove Point site even though export is not included on the list of authorized activities under the Agreement?

For the reasons that follow, we shall affirm the judgment of the circuit court.

## FACTUAL AND PROCEDURAL HISTORY

Columbia Gas was Dominion's predecessor in ownership of a 1,017 acre parcel of land in Maryland located at, and referred to as, Cove Point. In 1972, Columbia Gas began to construct a liquid natural gas ("LNG") import terminal on a portion of the land. Natural gas[1] is liquified in order to transport it because in its gaseous state, it takes up 600 times as much space as LNG. At this time, it was necessary to transport natural gas because it was

---

[1] Natural Gas is a fossil fuel that is extracted from the earth and transported to power plants and converted into energy sources such as electricity. *See Natural Gas*, ENVIRONMENTAL PROTECTION AGENCY, http://www.epa.gov/cleanenergy/energy-and-you/affect/natural-gas.html (last accessed Dec. 26, 2013).

only available if imported from foreign nations. In 1978, after interested parties expressed concern regarding potential harm to the environment, Columbia Gas, the Sierra Club and the Maryland Conservation Counsel Inc. ("MCC") entered into an agreement regarding the use of Cove Point. After the 1978 agreement went into effect, Columbia Gas began importing LNG at Cove Point, but suspended operations in 1980. In 1994, Columbia Gas desired to reopen Cove Point to add new "peaking" services. Peaking is a service that allows energy providers to store natural gas for future use by utility companies during peak energy use time periods. Providing peaking services would require Colombia Gas to construct liquification capabilities at the Cove Point facility. The three parties negotiated a new agreement, granting Columbia Gas the ability to liquefy, store and regasify natural gas. In 2002, Dominion purchased Cove Point from Columbia Gas.

*2005 Agreement*

Between 1994 and 2005, Cove Point was used only to import natural gas and for peaking services. However, in 2005, Dominion sought to expand its Cove Point operations to meet rising domestic natural gas demand. As a result, Dominion, Sierra Club and MCC negotiated a new agreement. It was agreed that the 2005 Agreement would replace in its entirety all previous agreements and understandings regarding use of Cove Point. The agreement provides that Dominion may use the area designated as the LNG Terminal Site solely to perform "LNG Terminal Operations." Within the Terminal Site, there is an area identified as the Fenced Area, which is where the natural gas tanks are located. The 2005

Agreement defines LNG Terminal Operations as:

> "**LNG Terminal Operations**" means and is limited to any use or activity related to (i) the construction, operation or maintenance of facilities and equipment associated with the following activities (a) through (j): (a) marine operations involving the importing of LNG; (b) the liquefaction of natural gas; (c) the storage of LNG in tanks; (d) the regasification of LNG; (e) the receipt by tanker and the receipt or delivery by pipeline of LNG, revaporized LNG or natural gas at or from the LNG Terminal Site; (f) the treatment of LNG or revaporized LNG by nitrogen injection or the separation and removal of constituent parts; (g) the provisioning of LNG tankers with water and miscellaneous supplies, provided that the principal method of provisioning LNG tankers shall be by means of shipments of materials and supplies from locations other than the Cove Point Site to the off-shore pier for storage and transfer to LNG tankers docked at the off-shore pier; (h) the recovery and use on the LNG Terminal Site for other LNG Terminal Operations of the cryogenic properties of LNG; (i) the recovery and use on the LNG Terminal Site of waste heat for other LNG Terminal Operations; (j) the generation or cogeneration of electricity within the limitations prescribed herein; and (ii) the construction, operation or maintenance of facilities and equipment directly supporting the foregoing activities (a) through (j), including office buildings, warehouses, maintenance shops, firefighting equipment and utilities.

As discussed more fully, *infra*, the 2005 Agreement provides for other rules regarding what operations may be performed and in some instances, explicitly prohibits other activities.

### Dominion's Proposed Export Project

Since 2005, the domestic natural gas market has changed dramatically. A new procedure known as hydraulic fracturing ("fracking") has unlocked vast new supplies of natural gas in the United States. Fracking is a process by which gas companies drill into layers of shale rock and extract gas reserves from within the rock.[2]

---

[2] *The Process of Hydraulic Fracturing*, ENVIRONMENTAL PROTECTION AGENCY, http://www2.epa.gov/hydraulicfracturing/process-hydraulic-fracturing (last accessed Jan. 2, (continued...)

In response to the new fracking developments, in 2011, Dominion announced plans to expand its Cove Point operations in order to add new export capabilities. Dominion applied to the Federal Energy Regulatory Commission ("FERC") to obtain permission to construct and operate the exporting facilities. It also sought approval from the federal Department of Energy to export natural gas to foreign countries.

Unlike the practice followed in prior instances of negotiating agreements prior to seeking approval of expansion, Dominion did not approach Sierra Club until several months after it sought federal approval. Sierra Club filed comments protesting the proposed expansion. Dominion then approached the Sierra Club and MCC, as required by the 2005 Agreement, to seek approval for the project. During discussions, the Sierra Club expressed that it did not intend to approve the proposed expansion.[3] As a result, Dominion revised its plans and proposed to construct new facilities outside of the Terminal Operations area that is subject to the 2005 Agreement. The Sierra Club then asserted that the 2005 Agreement does not authorize LNG to be exported from the Terminal Site. Dominion thereafter filed an action for declaratory judgment against Sierra Club and MCC in the circuit court.

*Circuit Court Proceedings*

In the circuit court, the parties filed cross motions for summary judgment. Dominion

_____

[2](...continued)
2014).

[3] Sierra Club avers that it challenges the expansion because of "signification upstream environmental and economic impacts."

- 4 -

sought judgment confirming its right to construct new liquefaction facilities within the Fenced Area and its right to transfer LNG from Cove Point to the offshore pier. The Sierra Club argued that the 2005 Agreement does not authorize Dominion to export LNG from the Cove Point facility because the Agreement "limits Dominion to an exclusive list of enumerated activities at Cove Point, and export of LNG is not authorized by that list."

Following a hearing on the cross motions, the circuit court issued an opinion and order in favor of Dominion. The circuit court reasoned:

> In my opinion, subsection (e) of Section 1.01 of the Agreement unambiguously does give Dominion the right to use the Cove Point Facility for the export of LNG. Excluding unnecessary words, subsection (e) of Section 1.1 allows Dominion to carry on activities related to (e) <u>the receipt by tanker and the receipt or delivery by pipeline of LNG, revaporized LNG, or natural gas at or from the LNG Terminal Site</u> . . . .

> To export LNG, Dominion will be transferring the LNG produced by the new liquification facilities by pipeline from the LNG Terminal Site to tankers docked at the offshore pier. From there, the LNG will be shipped to customers in other countries. Subparagraph (e) expressly permits the facility to be used for "receipt by tanker of LNG . . . from the Terminal Site." The Agreement specifically allows for "the delivery by pipeline of LNG from the LNG Terminal Site." This plainly allows the tankers at the pier to receive LNG from the Terminal Site.

> In its summary judgment, the Sierra Club, in various ways, attempts to circumvent the plain language of subsection (e). For the reasons set forth in Dominion's opposition to the Sierra Club's motion, I do not find that any of those arguments are persuasive.

The court ordered that the new liquefaction facilities could be built within the Fenced Area and that Dominion could export LNG from the Terminal Site to the offshore pier. Sierra Club noted a timely appeal. MCC did not join in the appeal.

Additional facts shall be provided, *infra*, to the extent they prove relevant in addressing the issue presented.

**STANDARD OF REVIEW**

Summary judgment is proper where the circuit court determines that there are no genuine disputes as to any material fact and that the moving party is entitled to judgment as matter of law. *See* Md. Rule 2-501. Disputes concerning contract interpretation are questions of law and frequently regarded as appropriate for summary judgment. *See Sandler v. Executive Mgmt. Plus*, 203 Md. App. 399, 423 (2012) (noting that contract interpretation is a question of law). *See also Bank of Montreal v. Signet Bank*, 193 F.3d 818, 835 (4th Cir. 1999).

We review a circuit court's grant of summary judgment *de novo*. *Mitchell v. Baltimore Sun Co.*, 164 Md. App. 497, 506 (2005). In reviewing the grant of a motion for summary judgment, appellate courts focus on whether the circuit court's grant of the motion was legally correct. *Laing v. Volkswagen of Am., Inc.*, 180 Md. App. 136, 152-53 (2008) (citations omitted). "The parameter for appellate review is determining 'whether a fair minded jury could find for the plaintiff in light of the pleadings and the evidence presented, and there must be more than a scintilla of evidence in order to proceed to trial. . . .'" *Id.* at 153. "Additionally, if the facts are susceptible to more than one inference, the court must view the inferences in the light most favorable to the non-moving party." *Id.*

## DISCUSSION

The Sierra Club argues that the 2005 Agreement does not authorize the exportation of LNG from the Terminal Site. It asserts that LNG may be received by tanker but not delivered to tankers and that "[t]he only 'marine operations' [the 2005 Agreement] authorizes are those 'involving the importing of LNG. . . .'"

Dominion responds that the 2005 Agreement authorizes it to take each individual step needed for exportation, even if the word itself is not explicitly mentioned in the Agreement. It challenges the Sierra Club's conclusion that because the word export is not listed in the Recitals of the Agreement, it is therefore prohibited. Dominion notes that the Court of Appeals has held that recitals do not trump the substantive provisions of an agreement and contends that the list of Terminal Operations is not exclusive. Dominion also asserts that the Agreement is unambiguous and therefore consideration of extrinsic evidence, specifically the parties' prior agreements, is improper. Finally, Dominion contends that this appeal is not about the 2005 Agreement, but rather a publicity ploy as part of the Sierra Club's national campaign against natural gas as an energy source.

In Maryland, when interpreting a contract, courts "seek to ascertain and effectuate the intention of the contracting parties." *Phoenix Services Ltd. Partnership v. Johns Hopkins Hosp.*, 167 Md. App. 327, 391 (2006) [hereinafter *Phoenix Services*]. In ascertaining the parties' intent, Maryland adheres to the objective theory of contract interpretation. *See Dumbarton Imp. Ass'n, Inc. v. Druid Ridge Cemetery Co.*, 434 Md. 37, 51 (2013). The

objective theory of contract interpretation requires that a court "must first determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated. In addition, when the language of the contract is plain and unambiguous there is no room for construction, and a court must presume that the parties meant what they expressed. In these circumstances, the true test of what is meant is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant." *Myers v. Kayhoe*, 391 Md. 188, 198 (2006) (quoting *Dennis v. Fire & Police Employees Ret. Sys.*, 390 Md. 639, 656-57 (2006)).

The process for determining the intent of the contracting parties is well established in Maryland. First, a court must ascertain whether the agreement is ambiguous. Language in a contract "may be ambiguous if it is 'general' and may suggest two meanings to a reasonably prudent layperson." *Pac. Indem. Co. v. Interstate Fire & Cas. Co.*, 302 Md. 383, 389 (1985). However, this Court has acknowledged that a contract is not ambiguous merely because the parties disagree as to its meaning. *See Fultz v. Shaffer*, 111 Md. App. 278, 299 (1996). Contracts are interpreted as a whole, and all disputed terms are to be interpreted in context. *See Phoenix Services*, 167 Md. App. at 392-93. A court's next step depends on whether it finds that the contract is ambiguous or unambiguous. If it finds that a contract is unambiguous, then it must only look to the language of the contract to determine the intent of the parties. *See Phoenix Services*, 167 Md. App. at 392. A court must presume that the terms expressed in the agreement are what the parties intended, regardless of what the parties

may have meant, but did not state in the contract. *Id.* When contract language is clear and unambiguous, there is no room for construction and courts may not consider what the parties thought the agreement meant. *See General Motors Acceptance Corp. v. Daniels*, 303 Md. 254, 261 (1985). *See also Phoenix Services*, 167 Md. App. at 392. If, on the other hand, a court finds that the contract is ambiguous, it must follow the second alternative, which is considering parol and/or extrinsic evidence to determine the parties' intent when the contract was made. *Id.* at 393.

### A. Is the 2005 Agreement ambiguous?

In the case *sub judice*, the Sierra Club, while it does not explicitly argue that the Agreement is ambiguous, avers that this Court should consider parol evidence, namely the parties' prior agreements and the state of the LNG market at the time of the contract's inception. In response, Dominion states that the 2005 Agreement is clear and unambiguous, and therefore, the prior dealings are inadmissible. Furthermore, Dominion asserts that the ambiguity argument is waived as the Sierra Club did not assert this claim at the circuit court. As noted earlier, we review under a *de novo* standard and accordingly, since ambiguity is one step of our contract interpretation analysis, we shall discuss whether the 2005 Agreement was ambiguous.

In *Dennis v. Fire & Police Employees' Retirement System*, 390 Md. 639, 642 (2006), the plaintiffs were two former police officers challenging the circuit court's finding that benefits from their retirement plan qualified as pension payments, thus entitling their former

spouses to a portion thereof. The plaintiffs became police officers in the 1960's and divorced their spouses in 1990 and 1993, respectively. *Id.* at 643-44. Each plaintiff's divorce decree required that the former wives were to receive 50% of any pension payments made to the plaintiffs. *Id.* In 1996, the plaintiffs began participating in a retirement option plan (named DROP) offered by their police department. *Id.* at 644. Upon their respective retirements in 2001 and 2002, the plaintiffs were notified that their DROP benefits would be treated as pension payments and accordingly, their wives would receive half. *Id.* at 645. Over the next few years, the plaintiffs challenged the classification of the DROP payments as pension before the Retirement System, the circuit court and, upon the grant of a bypass certiorari, the Court of Appeals. *Id.* at 645-47.

Before the Court of Appeals, the plaintiffs argued that under the language of the qualified domestic relations orders, the DROP payments did not qualify as pension payments and therefore, the former wives were not entitled to any portion. *Id.* at 650. In support, they contended that the DROP program was not offered until years after their divorces, therefore the parties could not have intended for the payments to be considered as pensions. *Id.* at 651. The Court applied ordinary contract interpretation principles to the domestic relations orders, concluding that the language of the orders was unambiguous and required that the DROP payments be considered pensions. It gave "effect to the clear terms of the agreements regardless of what the parties may have intended by those terms at the time of contract formation." *Id.* at 656. The Court declined to accept the plaintiffs' plea to consider the

subjective intent of the parties at the time of the divorce because the contract terms were clear and therefore, under the objective theory, courts must abide by the clear meaning of the terms. *Id.* at 658.

Maryland Courts have acknowledged that when determining whether a contract is ambiguous, the mere fact that the parties disagree as to the meaning does not necessarily render it ambiguous. *See Young v. Anne Arundel County*, 146 Md. App. 526, 587 (2002) (citing *Fultz v. Shaffer*, 111 Md. App. 278, 298 (1996)). The test is whether a reasonably prudent person would consider the contract subject to more than one reasonable interpretation. In *Sy-Lene of Washington, Inc. v. Starwood Urban Retail II, LLC*, 376 Md. 157 (2003), the plaintiff was a lingerie shop which leased a retail space in a shopping center owned by the defendant. *Id.* at 160. As part of the lease, the defendant agreed to provide employee parking spaces at a reduced fee and reserved "the right to limit the number of employee parking spaces to be provided. . . ." *Id.* at 161. The plaintiff requested five spaces; the defendant denied that request and charged them more than the reduced amount guaranteed in the lease. *Id.* It later informed the plaintiff that it would be canceling the monthly parking agreement entirely. The plaintiff sued, arguing that the lease provision which allowed the defendant to restrict the number of spaces did not allow it to eliminate all of its parking. *Id.* The circuit court granted the defendants' motion to dismiss, stating that the contract was not ambiguous. *Id.* at 162. We affirmed the circuit court's ruling and the Court of Appeals granted *certiorari*. *Id.*

- 11 -

Before the Court of Appeals, the plaintiff argued that the lease was ambiguous and that parol evidence should be admitted to determine the parties' intent at the time the lease was signed. *Id.* at 165. The defendant countered, arguing that the plain language of the lease did not provide any upper or lower limit to the number of spaces that must be provided, and therefore, it could eliminate all the spaces. It also argued that because the language was clear, no parol evidence should be admitted. *Id.* at 166. The Court noted that under the objective test of contract interpretation, if the written contract is clear the court will give effect to its plain meaning. It explained, however, that a contract is ambiguous if it could be "subject to more than one interpretation when read by a reasonably prudent person." *Id.* at 167. The Court then looked to the language of the contract, to answer the question of whether the term "limit" meant that the defendant could eliminate. *Id.* at 168. First, it reviewed the dictionary definition of the word "limit," and then addressed the parties' arguments regarding the various meanings of the term. After examining caselaw from other states, the Court concluded that the "limit" did not mean "eliminate" and ruled that the defendant could not deny plaintiff any parking spaces entirely. *Id.* at 169. The Court remanded the case back to the circuit court in order for it to consider parol evidence and determine the intended amount of spaces at the time of contracting. *Id.*

In the instant case, the dispute concerns what activities are permitted by the phrase "receipt by tanker and the receipt or delivery by pipeline." As the Court of Appeals did in *Sy-Lene*, we will begin with the dictionary definition to determine whether there is any

- 12 -

ambiguity in the phrase.  The American Heritage Dictionary defines "receipt" as "the act of receiving something" and delivery as "the act of conveying or delivering."  American Heritage Dictionary (5th. Edition 2013).  It lists several definitions for the preposition "by,"[4]

---

[4] **by** (b ) *prep.*

1. Close to; next to: *the window by the door*.

2. With the use or help of; through: *We came by the back road*.

3. Up to and beyond; past: *We drove by the house*.

4. At or to: *stopped by the bakery; came by the house*.

5. In the period of; during: *sleeping by day*.

6. Not later than: *by 5:30 PM*.

7.
> a. In the amount of: *letters by the thousands*.
> b. To the extent of: *shorter by two inches*.

8.
> a. According to: *played by the rules*.
> b. With respect to: *siblings by blood*.

9. In the name of: *swore by the Bible to tell the truth*.

10. Through the agency or action of: *was killed by a bullet*.

11. Used to indicate a succession of specified individuals, groups, or quantities: *One by one they left. They were persuaded little by little.*

12.
> a. Used in multiplication and division: *Multiply 4 by 6 to get 24*.
> b. Used with measurements: *a room 12 by 18 feet*.
> c. Toward. Used to express direction with points of the compass: *south*

(continued...)

but, the only one that logically applies to the phrase as written is the definition "with the use of; through." The American Heritage Dictionary, 182 (1981). It is also evident that this is the correct meaning of "by." During oral argument, both parties used the analogy of "delivery by mail" to illustrate the manner in which the word "by" was used in the Agreement. Therefore, taking into account the dictionary definition, it is clear that the Agreement authorizes LNG to be received from tankers and to be received or delivered through the pipeline. As the Sierra Club conceded at oral argument, this phrase could have been worded differently to more accurately reflect what activity was being authorized. However, it does not render the clause ambiguous. Furthermore, as noted above, the fact that the parties disagree over the meaning of the phrase does not render the contract, in its entirety, ambiguous. We conclude that the language is clear and that the meaning of the disputed phrase is not ambiguous.

**B. What does the language of the 2005 Agreement express as the parties' intent?**

Since the 2005 Agreement is not ambiguous, we must look to its language to determine whether it explains what the parties intended. Here, the crux of the dispute is not whether a term provides for the performance of some activity, but rather whether the failure to prohibit exportation means that it is permissible.

This Court recently addressed a contractual dispute that is similar in *John Newell et*

---

[4](...continued)
    *by east.*

*al. v. Johns Hopkins University*, 215 Md. App. 217 (2013). In *Newell*, Ms. Banks, the owner of a large piece of property, referred to as Belward Farms, had "stiff armed [many] efforts to buy and develop" the Farm because of her disdain of massive development projects that were occurring around her property in Montgomery County. *Id.* at 221. Ms. Banks desired the Farm to remain as natural as possible; however, due to County imposed assessments, she was unable to afford to stay on the Farm. *Id.* As a result, Ms. Banks, a long time friend of Johns Hopkins University, entered into a "sale-and-gift transaction" in which she would continue to live on the farm until her death. After which Hopkins would develop the land into an educational campus "for agricultural, academic, research and development, delivery of health and medical care and services, or related purposes only." *Id.* at 223. At some point after the deal was made but before Ms. Banks' death, it became evident to her and her family members that the campus Hopkins intended to build had transformed into something Ms. Banks did not envision at the time the agreement was made. *Id.* at 225. There would be significantly less "open green space" and larger housing developments. *Id.* at 228. After decades of conflict, during which time Ms. Banks died, her family brought a declaratory judgment in an effort to prohibit Hopkins from building their proposed campus on Belward Farms, asserting that it violated the agreement made between the University and Ms. Banks. *Id.* Hopkins moved for summary judgment, arguing that while the plain language of the agreement did prohibit many things, it did not specifically prohibit it from constructing the

buildings which the family opposed.[5] Ms. Banks' family filed a cross motion for summary judgment arguing that there was no ambiguity in the terms and that the agreement specifically prohibited the development Hopkins intended. *Id.* at 229. The circuit court granted summary judgment in favor of Hopkins, finding that the language of the agreement was unambiguous and plainly did not prohibit the type of development sought. *Id.* at 230. It also found in the alternative that if the agreement was ambiguous, Hopkins was still entitled to summary judgment because after considering extrinsic evidence provided by the family, that the rule in favor of the unrestricted use of property, "did not tip the balance in the Family's favor." *Id.* at 232. The family appealed.

This Court began by examining the language of the contract to determine whether it was ambiguous. *Id.* at 235. We noted, "[w]here the instrument includes clear and unambiguous language of the parties' intent, we will not sail into less charted waters to interpret 'what the parties thought the agreement meant or intended to mean.'" *Id.* at 236. (quoting *Long Green Valley Ass'n v. Bellevale Farms, Inc.*, 432 Md. 292 (2013)). We explained that this rule is to ensure "certainty in contracting" and that it is especially applied as to restrictive covenants which "'are meant to be enforced as written.'" *Id.* (quoting *Chestnut Real Estate Partnership v. Huber*, 148 Md. App. 190, 202 (2002)). We stated that when determining ambiguity, we begin our review with the disputed language but consider

---

[5] The family opposed the construction of larger, tall housing buildings, and leasing space to other organizations. *Newell,* 215 Md. App. at 230.

the contract as a whole. The family requested that the Court interpret the language of the agreement in different ways. For example, it requested a strictly literal interpretation of the clause that stated that the agreement's purpose was to "limit its use" of the property. *Id*. at 238. The family contended that "its" referred only to Hopkins, which implicitly meant that it could not lease the property to be used by others. We declined to adhere to this reading. In another instance, the family requested the Court to interpret the term "campus" as limiting the size and density of any proposed development, even though there was no size or density requirement in the agreement. *Id.* Determining that campus was not defined in the agreement, we also declined to adhere to this reading. We acknowledged that the vision of the campus that Ms. Banks and the family had was undoubtedly different from the campus Hopkins proposed; however, "our task [was] to examine the agreement the parties did sign, not the agreement that one or the other now wishes they had negotiated instead." *Id*. at 242. Accordingly, we concluded that the agreement was not ambiguous and affirmed the circuit court's judgment denying the family's sought relief. *Id*.

The Court of Appeals, in *Pulaski v. Riland*, 199 Md. 426 (1952), addressed a contract dispute where the defendant asserted that an act was allowed because a contract did not explicitly prohibit it. There, a doctor and his third wife entered into a post nuptial agreement which was intended to "settle their *property* rights." *Id*. at 428. The agreement was that the doctor would pay the wife weekly support until the two were divorced and each would waive their dower rights against each other. *Id.* After this agreement was executed, the doctor and

the plaintiff began living together. Before he and the defendant finalized their divorce, the doctor died. *Id.* In his will, he left his estate to his four children by his second wife, and the remainder to his son with the plaintiff. *Id.* The defendant filed an action seeking her statutory share of the doctor's estate as his surviving widow. *Id.* at 428-29. The plaintiff alleged that the postnuptial agreement effectively waived her right to such a claim. In support, the plaintiff presented evidence that the doctor intended that the post nuptial agreement serve as the defendant signing over any claim she had to his property, so that he could leave his estate to his son with the plaintiff. *Id.* at 430. The circuit court ruled for the defendant, finding that the agreement did not prohibit her from her statutory share. *Id.*

The Court of Appeals considered the plaintiff's argument that because the recitals in the agreement stated that the parties "'have determined to herewith, settle *their* property rights[,]'" that the agreement did in fact do such. *Id.* at 431. However, the Court explained, the recital of an agreement was not dispositive and it must look to the substantive parts of the agreement to see whether it actually settled their property rights. *Id.* After considering case law and the statutes regarding a surviving spouse's rights, the Court concluded that, notwithstanding the intent of the doctor, the agreement did not prohibit the wife from taking her statutory share "unless there [was] a clear statement to that effect[.]" *Id.* at 434. As a result, it granted the defendant her share of the doctor's estate.

In the case at bar, the dispute is centered around whether exporting LNG qualifies as an LNG Terminal Operation under the clause "(e) the receipt by tanker and the receipt or

delivery by pipeline of LNG, revaporized LNG or natural gas at or from the LNG Terminal

Site[.]" The Sierra Club argues that the answer to that question is no because the recitals of

the agreement make clear what the purpose of the facility is for, and while it mentions the

terminal "is for the importation, storage, regasification, and transmission" of LNG, it does

not mention exportation anywhere. However, as this Court explained in *Pulaski*, clauses

from the recitals do not necessarily limit the substantive clauses of an agreement. We must

examine the whole agreement to determine what was intended.

As explained earlier, the Agreement authorizes LNG to be received from tankers and

to be received or delivered via the pipeline. The Sierra Club would like this court to

conclude that natural gas may be moved back and forth for peaking services only and to

accept as dispositive the fact that the word "export" is not mentioned anywhere in the 2005

Agreement.[6] However, we must examine the words and language of the entire contract to

determine whether exportation is a process authorized under the Agreement. The Sierra Club

contends that the list in Section 1.01 enumerating permitted LNG Terminal Operations is

exclusive. This is true to some extent. It does list the only operations that may be conducted

on the Terminal Site; however, the preamble to the list explicitly provides that Dominion may

perform "any use or activity" related to the identified operations. Like the disputed clause

in *Newell*, Section 1.01 is both limiting and broad. The Terminal Operations list provides

---

[6] Notably, the word "import" is only used twice in the thirty four page document: once in the recitals and once in Section 1.01 referencing marine operations related to importation.

that: "LNG Terminal Operations means and is limited to any use or activity related to (i) the construction, operation or maintenance of facilities and equipment associated with . . . (e) the receipt by tanker and the receipt or delivery by pipeline of LNG, revaporized LNG or natural gas at or from the LNG Terminal Site." Any use or activity therefore includes importing, processes related to peaking services and exporting.

In its brief and at oral argument, Dominion explained that every step required for exportation is allowed by the Agreement. The first step would be to create LNG – a process which is permitted by the Agreement and not challenged by the Sierra Club. The second step is moving the LNG to a place where it can be transported from Cove Point. The Sierra Club contends that "the receipt by tanker" means that LNG may only be imported. However, it fails to consider the very next phrase "and the receipt or delivery by pipeline of LNG." This clearly means that natural gas may be sent both ways – to and from the Terminal Operation site. The Sierra Club implores this Court to interpret the clause to mean that receipt or delivery by pipeline is intended only for sending "gas from the facilities to its customers and to receiv[ing] gas for peaking purposes" yet not for exportation even though none of these uses are explicitly stated in the clause. In fact, the word peaking is not mentioned in the 2005 Agreement, although Sierra Club does not dispute that is authorized under the agreement. We decline to accept one implied meaning and reject another. As stated in Section 1.01 of the Agreement, conduct is "limited to any use or activity" related to the listed operations. As exportation is a use or activity related to the receipt and delivery by pipeline, the plain

- 20 -

reading of the clause permits gas to transported for exportation. Similar to this Court's refusal in *Newell* to adopt the family's interpretation of various clauses, we will not engage in selective interpretation in order to craft an agreement that Sierra Club now wishes it had drafted in 2005. The last step of exportation requires sending the gas from the Terminal Site to the offshore pier, which is the only destination for any gas sent or received by pipeline as the pipeline only runs from the offshore pier to the Terminal Site. Sierra Club contends that Dominion cannot perform whatever activities it wants at the offshore site because the activities must be related to the authorized Terminal Operations. We are not persuaded. The offshore site is not referenced once in the Agreement. It is evident that none of the Agreement's provisions apply to operations at the offshore site. Accordingly, Dominion may perform activities there that are not approved of by the Sierra Club as long as they are permitted by the applicable state and federal regulatory agencies.

After examining the disputed clause, as we did in *Newell* and *Pulaski*, we take into consideration the Agreement as a whole. Reading the contract as permitting exportation does not create ambiguity in other parts of the contract or render the contract illogical. Additionally, it is notable that Sierra Club took the opportunity to explicitly prohibit particular actions in the 2005 Agreement. For example, Section 2.03 states that Dominion may not transport LNG by truck without consent of Sierra Club; Section 2.05 prohibits Dominion from generating electricity for sale off of Cove Point without consent of Sierra Club; and Section 2.06 prohibits construction of new structures outside of the Fenced Area

- 21 -

without prior consent. Clearly, Sierra Club understood that it had the ability to negotiate terms that explicitly prohibit activities in the Agreement. Accordingly, had it intended that Cove Point be used exclusively for import it was free to seek to include that restriction in the substantive provisions. Considering the Agreement as a whole, the recital that Cove Point is "for the importation, storage, regasification and transmission of LNG" is not sufficient to preclude exports. Because the 2005 Agreement's language is clear and unambiguous, we find that the circuit court did not err in granting Dominion's declaratory judgment.

**C. Even if the Agreement was ambiguous, would that change the outcome?**

The Sierra Club also argues that the 2005 Agreement was ambiguous. Although there is no need to address this issue since we have already concluded the Agreement is unambiguous, we nevertheless conclude that even if we considered extrinsic evidence, the Agreement still authorizes exports. The Sierra Club offers three forms of extrinsic evidence to support its claim that exportation is not authorized: 1) the history of LNG in the US and the fact that exporting was not possible in 2005 so it could not have been intended; 2) the 1972 and 1994 agreements only authorize import and not export; and 3) the impact to the Chesapeake Bay would be detrimental.

*i. Exportation Not Possible Pre-2005*

The Sierra Club highlights that exportation was not possible until well after the 2005 Agreement was entered into, a fact which Dominion admits. Therefore, Sierra Club asserts "it strains credulity to think the Agreement nonetheless authorize[s] an export project that

was not possible at the time it was drafted.  In 2005, no reasonable person would have thought it authorized LNG exports because such exports were neither possible nor contemplated."

Both parties discussed the Court of Appeals case *Slice v. Carozza Properties, Inc.*, 215 Md. 357 (1958) at oral argument.  In *Slice*, the plaintiff leased a store in the defendant-shopping center.  In its lease the plaintiff received the exclusive right to sell "off-the-premises" beer and wine.  *Id.* at 360.  Later, the defendant-shopping center built a second shopping area nearby, with several more stores and restaurants and leased one of the spaces to the defendant-restaurant.  *Id.* at 361.  The restaurant began selling both on and off the premises beer and wine.  *Id.*  The plaintiff sued the shopping center and the restaurant, and the restaurant's owners, seeking an injunction, after the shopping center refused to instruct the restaurant that the plaintiff had the exclusive right to sell off the premises alcohol.  The trial court ruled in favor of the defendants, finding that the second shopping center was not contemplated at the time the plaintiff's lease was signed, and therefore the restriction could not apply to the restaurant.  *Id.* at 365.

On appeal, the defendants' main argument was that they should not be required to abide by the restriction because at the time the contract was made, neither the defendant-shopping center nor the plaintiff anticipated there would be another shopping center with another store that could sell alcohol.  *Id.* at 368.  The Court of Appeals cited a number of cases from around the country where after a contract was entered into, the circumstances

- 23 -

changed in a way unanticipated by both parties, however, the language of the contract was found to control. *Id.* at 369-70. The Court concluded that even though the second shopping center was probably not contemplated when the plaintiff and defendant-shopping center entered into the lease, using objective contract interpretation, the language of the contract controlled. *Id.* at 370.

Applying this principle to the instant case, the 2005 Agreement was executed at a time when neither party anticipated that Cove Point could be used to export LNG. After the contract was signed, the circumstances changed, making exporting LNG a possibility. Akin to *Slice*, the fact that new applications of technology changed the circumstances does not negate the language of the 2005 contract. Since the words of the contract permit exportation, objective contract interpretation requires that it be allowed. Therefore, although exporting may not have been contemplated in 2005, the Agreement can still authorize the activity.

*ii. Prior Agreements Demonstrate That Cove Point Intended For Import Only*

The Sierra Club also asks this Court to consider the 1972 and 1994 agreements because they will further prove that the site was never intended for export. In response, Dominion notes that the 2005 Agreement begins with a clause that states that it "supersedes any and all other prior agreements and understandings, written or oral, among the parties with respect to such subject matter, including (without limitation) the 1994 Agreement."

According to the Sierra Club, the language of the 1972 Agreement established that the purpose of the terminal was for LNG import. A reading of the entire 1972 Agreement

reveals that the overriding concern was the environmental impact on the land. The agreement focuses considerably less on the operations that will be performed on the Site than it does on how Columbia Gas intends to preserve the natural condition of the land. The agreement discusses topics such as Columbia Gas' agreement to maintain the freshwater marsh and to restrict construction in an effort to "preserve the area as a wildlife preserve . . . [and] to preserve the ecological value" of the land. The 1972 Agreement makes it clear that the concern at that point in time was about "minimiz[ing] adverse environmental impacts upon the property."

The 1994 Agreement contains some of the provisions of the 1972 Agreement. However, while it maintained some of the environmental concerns from the 1972 Agreement, it was much more concerned with actual operations of the Site. Like the 2005 Agreement, the 1994 Agreement states in the recitals that the terminal is "for the importation, storage, regasification and transmission of LNG." The 1994 Agreement also imposes many more restrictions than the 1972 Agreement did on the types of activities that can be performed on Cove Point. The disputed "receipt or delivery by pipeline" language was first introduced in the 1994 Agreement and was added in order to authorize the new peaking services.

After a complete reading of both prior agreements, we conclude they do not clearly demonstrate that the Cove Point was to be used only for importing. The 1972 Agreement provides little guidance, as its focus is largely on regulating the impacts to the environment. Likewise, the 1994 Agreement is not helpful because it could create a similar problem that

we are addressing now. Sierra Club admits that the 1994 Agreement was intended to authorize changes to allow peaking services to be provided. However, the term peaking is never used in the agreement. Sierra Club does not contend that peaking was not authorized by the 1994 Agreement even though the word was not used. In fact, it employs Dominion's argument in the case sub judice. Because the Agreement authorized the processes necessary for peaking to be performed (namely receiving and delivering LNG by pipeline and storage), peaking was authorized, even though its not explicitly mentioned. Accordingly, the prior Agreements would not be useful in clarifying any ambiguity in the 2005 Agreement.

*iii. The Impact To Chesapeake Bay Would Be Detrimental*

Sierra Club maintains that its primary concern with Dominion's Cove Point activities are with the "serious risks for the region and the country." It objects to exporting LNG because it "would greatly increase industrial activities at the sensitive Cove Point site and throughout the region." Sierra Club contends that the project will result in more pollution, increased risk of water pollution, greater volume of tanker traffic in the Chesapeake Bay and could raise domestic natural gas and electric prices. Dominion on the other hand, avers that the project will produce jobs for Calvert County, including as many as 100 permanent jobs, and generate hundreds of millions of dollars in state and federal taxes.

We do not wish to underestimate the potential environmental impacts this project may have on the Cove Point site and the Chesapeake Bay. However, Sierra Club had an opportunity, when it drafted the Agreement, to express concerns regarding environmental

- 26 -

impacts. Sierra Club negotiated these restrictions, easements and covenants in an effort to permit industrial development that was effective and sustainable. As we have explained above, the activities Dominion wishes to perform now are permitted by the 2005 Agreement. Whether there are undue environmental impacts is an issue that will be the subject of review by governmental agencies having jurisdiction over that issue.

**JUDGMENT OF THE CIRCUIT COURT FOR CALVERT COUNTY IS AFFIRMED. COSTS TO BE PAID BY APPELLANT.**