IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1702

September Term, 2013

_____

THOMAS A. HUGGINS, ET AL.

v.

HUGGINS & HARRISON, INC.

_____

Kehoe,
Arthur,
Leahy,

JJ.

_____

Opinion by Arthur, J.

_____

Filed: December 2, 2014

This case involves a dispute over a landlord's contractual right to terminate a long-term commercial lease and to require the tenants to renegotiate the terms. The tenants, appellants Thomas A. Huggins ("Thomas") and his company, TAH, Inc. ("TAH"), contend that the landlord has no such right; the landlord, a related family business by the name of Huggins & Harrison, Inc. ("H&H"), contends that it does.

The Circuit Court for Montgomery County determined that the pertinent lease provision was unambiguous and, accordingly, declined to consider Thomas's and TAH's extrinsic evidence of the parties' alleged intentions at the time when they drafted the lease. The court proceeded to declare that, under the language of the pertinent provision, H&H did not have the right to terminate the lease at the time when Thomas and TAH first filed this suit, but that the right to terminate had arisen during the pendency of the suit. Thomas and TAH took this timely appeal.

**QUESTIONS PRESENTED**

Thomas and TAH raise two issues on appeal, which, for clarity and concision, we restate as follows:

I.      Did the circuit court err in ruling that the termination provisions of the lease were unambiguous and in excluding extrinsic evidence of the parties' alleged intentions?

II.     Did the circuit court issue an improper advisory opinion concerning H&H's right to terminate the lease on the basis of events that occurred during the pendency of the litigation?[1]

---

[1] Thomas and TAH phrased their questions in the following manner:

(continued...)

For the reasons that follow, we find no error.

## THE FACTS

We recount the facts in the light most favorable to H&H, the party that prevailed below. *Green v. McClintock*, 218 Md. App. 336, 341 (2014); *L.W. Wolfe Enters., Inc. v. Maryland Nat'l Golf, L.P.*, 165 Md. App. 339, 343 (2005).

### A. The Parties

Thomas is the president of TAH. Thomas and TAH run a gasoline and service station, as well as a U-Haul franchise, at the property located at 10619 Connecticut Avenue, in Kensington, Maryland.

H&H is a Maryland corporation and is the owner and landlord of the property. Before his death in 1993, Thomas's father, Francis M. Huggins Jr., owned all of the shares in H&H. Upon Mr. Huggins's death, his shares went to his wife, Helen H. Huggins, who became H&H's president.

---

[1] (...continued)

I.  The Lower Court Failed to Engage in Proper Interpretation of the Lease Provision at Issue in This Case.

II.  Where the Trial Court Failed to Interpret the Lease in Accordance With the Reasonable Interpretation of the Parties at the Time it was Effected, the Court Should Have at Least Found and Declared Ambiguity in the Lease Provision at Issue, [Subparagraph 2(a) of the 2003 Addendum to Lease] and, Thereupon, Considered the Substantial Extrinsic Evidence it Appeared to Take at Trial.

III.  The Court Exceeded the Justiciable Controversy Before it by Rendering Determination Based on Facts Yet to Occur.

Mrs. Huggins transferred some of her shares to her children during her lifetime, but remained the majority shareholder until her death on November 13, 2009. Upon Mrs. Huggins's death, the remaining shares of H&H went to each of her children in equal percentages. Hence, Thomas is a shareholder of H&H, as are the other Huggins siblings: William Huggins ("William"), Harold Huggins, Marion Coleman, Elizabeth Ann Pender, Patricia Mudgett, and Linda Huggins (via an irrevocable trust).

## B. Prior Rental Agreements

Thomas has operated the gasoline and service station at the property since approximately 1986. At first, Thomas operated the station pursuant to a verbal agreement between himself and his late father. Under that agreement, Thomas paid an initial base rent of $2,500 a month. In or about 1993, that amount increased to $3,500 a month.

In 1993, a few months before Thomas's father died, he allegedly signed no fewer than three different leases for the property, none of which are fully completed and executed. Thomas failed to produce a version with the original signatures affixed, and he and his sister Linda acknowledged that some of the blanks on some of the documents were filled in after their father's death. Other than Linda and Thomas, none of the Huggins siblings knew of any of the 1993 leases at that time.

The other siblings first learned of a 1993 lease some years later, when Thomas told his sister Patricia Mudgett about a potential sublease for the property. Ms. Mudgett, a realtor, informed Thomas that he could not sublease the property because he had no lease.

Thomas evidently responded by showing her a lease, but he also admitted to her that he had filled in the blanks. In 2002, Ms. Mudgett and her younger brother William questioned the validity of the 1993 lease.

On May 9, 2002, Mrs. Huggins, as president of H&H, signed a formal lease for the property. The lease provided for an initial term of six years, to be followed by six successive terms of six years each (for a total of 42 years). The new lease did not prohibit Thomas from subleasing the property.

When Thomas's siblings learned of the lease, they discussed its implications with their elderly mother. As a result of those discussions, Mrs. Huggins signed an affidavit stating that she had not understood the terms of the lease. In addition, she demanded that Thomas terminate the lease, which he did on June 15, 2002. William then presented Thomas with another lease, which Thomas refused to sign. Consequently, there was, at that time, no valid lease for the property.

By this time, in the early 2000s, H&H was cash poor and was struggling financially. In the summer of 2002, Helen Huggins and family members discussed this problem, and each member was encouraged to find the "highest and best use" for the property.

At about this time, William became aware that Montgomery County was undertaking a zoning study of Kensington's master plan. In light of the potential change to the plan, William explored possibilities for the property that were consistent with the

-4-

goal of "highest and best use."

###    C.    The Current Lease Documents

On October 16, 2002, Thomas and H&H (through his mother, Mrs. Huggins) executed temporary lease documents that would apply until the parties could reach a final determination about the property. The parties signed the documents in anticipation of a trip to Europe that Mrs. Huggins planned to take for several months in late 2002.

The temporary lease provided that if Mrs. Huggins did not return from her trip, Thomas would have a six-year lease with the option to renew the lease for two successive leasehold terms of six years each, "and for an additional leasehold term thereafter of two [] years in duration." Under this lease, Thomas would have no right to sublease the property. On the other hand, if Mrs. Huggins did return, the lease provided that it would terminate automatically on May 31, 2003.

After Thomas's mother returned safely from her trip, the parties signed an extension of the October 2002 lease, effective May 31, 2003, so that negotiations could continue.

On August 27, 2003, Thomas (individually and as president of TAH) and Helen Huggins (as president of H&H) signed an addendum. The addendum extended all terms of the October 2002 lease, subject to several new conditions.

Specifically, according to sections 2(a)-(d) of the addendum, the lease would terminate upon the first of the following events:

(a) The appropriate Government officials allow or require a zoning change for the Premises, or a building permit is issued for the development of the Premises, at which time the parties will renegotiate this Lease;

(b) Tom [Thomas] shall no longer be personally involved in the day-to-day operating of a gas station on the Premises;

(c) The Lessee [Thomas] shall be in violation of the terms of this Lease; or

(d) Upon thirty (30) days written notice of termination from the Lessee [Thomas] to the Lessor [H&H].

In summary, the current lease documents consist of the lease of October 16, 2002, the extension of May 31, 2003, and the addendum of August 27, 2003.

## D.     H&H's Efforts to Develop the Property

Between 2003 and 2005, H&H explored various plans to redevelop the property, with and without a service station. Eventually, however, Mrs. Huggins decided not to proceed with the plans because of her advanced age and the financial risks that were associated with the project.

## E.     Mrs. Huggins's Death, and H&H's Effort to Renegotiate the Lease

Helen Huggins died in November 2009, and her son William succeeded her as H&H's president in January 2010. Thereafter, in July 2011, the Huggins siblings met to discuss what to do with the property. The siblings decided that the property would be advertised for sale or lease. All of the siblings, including Thomas, voted in favor of trying to sell or lease the property – Thomas stated that he "would not stand in the way" of a sale or lease.

On February 14, 2012, William sent a letter on behalf of H&H to Thomas, citing a right to renegotiate the lease under section 2(a) of the addendum (which, by its terms, is triggered when "[t]he appropriate Government officials allow or require a zoning change for the Premises"). William sent the letter in anticipation of a zoning change for the town of Kensington; he believed that approval was imminent and that a reasonable amount of time would be needed to renegotiate the lease.

When Thomas did not respond, William sent another letter on March 9, 2012, again requesting renegotiation.

On March 20, 2012, the County Council for Montgomery County approved a draft of the Planning Board Kensington Sector Plan, which, among other things, would allow for a zoning change for the property. On March 28, 2012, William sent yet another letter to Thomas, in which he again requested renegotiation and stated that the Council had taken a formal vote pertaining to this Kensington Sector Plan.

Despite these letters, however, Thomas refused to renegotiate the lease and further indicated that he wanted to pay the same rent ($3,500 a month) that he had been paying since about 1993.

On April 10, 2012, counsel for H&H sent a letter to Thomas, titled: "NOTICE OF VIOLATION OF LEASE AND LANDLORD'S DESIRE TO REPOSSESS THE LEASE PREMISES." The letter referred to William's letter of March 28, 2012, and asserted that Thomas had violated the lease because of (1) his failure to respond to prior requests for

lease renegotiation pursuant to section 2(a) of the addendum, and (2) his "failure to keep the leased premises in a clean, orderly, and sanitary condition, free of trash, junk and debris, and for using adjacent property that is not part of the leased premises for the parking and/or storage of vehicles." Counsel's letter notified Thomas of H&H's desire to repossess the property.

### F. The Declaratory Judgment Action

In response, Thomas and TAH commenced this lawsuit on May 18, 2012, by filing a complaint for declaratory judgment and injunctive relief. In brief, they contended that the addendum was ambiguous and therefore that the court should consider parol evidence, which, they said, would establish that the parties intended for section 2(a) to be triggered only if government officials required or allowed a zoning change or issued a building permit in response to a request by H&H.

While the case was pending, in October 2012, Montgomery County officially re-zoned the property, as William Huggins had anticipated.

### G. The Circuit Court's Ruling

After denying H&H's motion for summary judgment, the court conducted a four-day trial. The trial included an extensive airing of the extrinsic evidence on which Thomas relied.

The circuit court issued a memorandum opinion and a declaratory judgment on September 24, 2013. Among other things, the court declared that:

(1)  the addendum is valid and enforceable;

(2)  section 2(a) of the addendum is not ambiguous, vague, or indefinite;

(3)  Thomas and TAH had not materially breached the lease on the grounds
asserted in the letters from William and H&H's counsel in March and April
2012 – *i.e.*, Thomas and TAH had not materially breached the lease by
failing to renegotiate the lease because of the mere prospect of a future
zoning change or by failing to keep the property in a "clean, orderly, and
sanitary condition";

(4) to require renegotiation of the lease under section 2(a) of the addendum,
H&H was not required to make specific requests or applications to
Montgomery County or the Town of Kensington for any zoning change;

(5) Thomas and TAH had no present obligation to renegotiate the lease
pursuant to section 2(a), because the triggering zoning changes had not yet
occurred when H&H requested renegotiation in early 2012; and

(6) H&H nonetheless was not precluded from demanding that Thomas and
TAH negotiate with H&H pursuant to section 2(a), as the triggering zoning
change had occurred after the start of the litigation.

Because the circuit court concluded that section 2(a) was unambiguous, it

disregarded Thomas's and TAH's extrinsic evidence of the parties' alleged subjective

intention that the provision would apply only if the "appropriate Government officials

allow[ed] or require[d] a zoning change" in response to a request by H&H.

Thomas and TAH took a timely appeal to this Court.

## THE STANDARD OF REVIEW

The central question in this case is whether section 2(a) of the addendum is

ambiguous.  "[T]he determination of ambiguity is one of law, not fact, and that

determination is subject to *de novo* review by the appellate court."  *Calomiris v. Woods*,

353 Md. 425, 434 (1999); *accord Ocean Petroleum Co., Inc. v. Yanek*, 416 Md. 74, 86 (2010) (quoting *Clancy v. King*, 405 Md. 541, 556-57 (2008)) ("'the determination of whether a contract is ambiguous, is a question of law,' which we review *de novo*").

**I.     The Circuit Court Correctly Concluded that Section 2(a) Was Not Ambiguous**

      **A.     The Applicable Legal Principles**

"Courts in Maryland apply the law of objective contract interpretation, which provides that '[t]he written language embodying the terms of an agreement will govern the rights and liabilities of the parties, irrespective of the intent of the parties at the time they entered into the contract, unless the written language is not susceptible of a clear and definite understanding.'" *Dumbarton Improvement Ass'n v. Druid Ridge Cemetery Co.*, 434 Md. 37, 51 (2013) (quoting *Slice v. Carozza Props., Inc.*, 215 Md. 357, 368 (1958)). For that reason, "'[a] contract's unambiguous language will not give way to what the parties thought the contract meant or intended it to mean at the time of execution.'" *Dumbarton*, 434 Md. at 51-52 (quoting *Sy-Lene of Washington, Inc. v. Starwood Urban Retail II, LLC*, 376 Md. 157, 167 (2003)). "Our task, therefore, when interpreting a contract, is not to discern the actual mindset of the parties at the time of the agreement, but rather, to 'determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated.'" *Dumbarton*, 434 Md. at 52 (quoting *Gen. Motors Acceptance Corp. v. Daniels*, 303 Md.

-10-

254, 261 (1985)).

"Maryland law generally requires giving legal effect to the clear terms of a contract and bars the admission of prior or contemporaneous agreements or negotiations to vary or contradict a written contractual term." *Calomiris*, 353 Md. at 432. "Under the parol evidence rule, a written agreement 'discharges prior agreements,' thereby rendering legally inoperative communications and negotiations leading up to the written contract." *Id.* (quoting Restatement (Second) of Contracts § 213 (1979)). Parol evidence becomes admissible only when "the written words are sufficiently ambiguous." *Calomiris*, 353 Md. at 433; *accord Dumbarton*, 434 Md. at 56.

"The requirement that courts give legal effect to the unambiguous provisions of a contract and the rule that prohibits the admission of parol evidence for ascertaining the parties' intent provide a necessary legal foundation for the certainty of contracting parties." *Calomiris*, 353 Md. at 432-33; *accord Newell v. Johns Hopkins Univ.*, 215 Md. App. 217, 235-36 (2013), *cert. denied*, 437 Md. 424 (2014). "This is all the more true" in the case of a lease (*see Newell*, 215 Md. App. at 236), which, as a document granting an interest in land, is required to be in writing under the Statute of Frauds. Md. Code (1974, 2010 Repl. Vol.), § 5-103 of the Real Property Article.

Under the objective view of contracts, "a written contract is ambiguous if, when read by a reasonably prudent person, it is susceptible of more than one meaning." *Calomiris*, 353 Md. at 436; *accord Dumbarton*, 434 Md. at 53; *Newell*, 215 Md. App. at

235. "The determination of whether language is susceptible of more than one meaning includes a consideration of 'the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution.'" *Calomiris*, 353 Md. at 436 (quoting *Pac. Indem. Co. v. Interstate Fire & Cas. Co.*, 302 Md. 383, 388 (1985)). Furthermore, "the parol evidence rule would not bar a court from considering the context of the transaction or the custom of the trade in a determination of ambiguity." *Calomiris*, 353 Md. at 436.

Nonetheless, "'[a]n ambiguity does not exist simply because a strained or conjectural construction can be given to a word.'" *Dumbarton*, 434 Md. at 53 (quoting *Belleview Constr. Co. v. Rugby Hall Cmty. Ass'n*, 321 Md. 152, 159 (1990)). Nor does an agreement become ambiguous merely because two parties, in litigation, offer different interpretations of its language. *Diamond Point Plaza Ltd. P'ship v. Wells Fargo Bank, N.A.*, 400 Md. 718, 751 (2007).

## B.  Section 2(a) of the Addendum Is Not Ambiguous

We could reverse the circuit court for refusing to consider extrinsic evidence of the parties' alleged intentions only if, after a plenary, *de novo* review of the addendum, we concluded that its language, when read by a reasonably prudent person, "is susceptible of more than one meaning." *Calomiris*, 353 Md. at 436. We cannot do so. The language was susceptible of only one meaning, and the circuit court properly interpreted the addendum according to that meaning without regard to any extrinsic evidence that might

have indicated otherwise.

As previously stated, under section 2(a) of the addendum, signed by all parties in August 2003, the lease would terminate upon the first of four events, which was that:

(a) The appropriate Government officials allow or require a zoning change for the Premises, or a building permit is issued for the development of the Premises, at which time the parties will renegotiate this Lease . . . .

Notably, the plain language of section 2(a) says nothing to limit its scope only to "zoning changes" that "[t]he appropriate Government officials" might "allow or require," or to building permits that the officials might issue, in response to a request by H&H.

The circuit court examined this section and determined that the language "was not susceptible of more than one meaning." Specifically, the court ruled that "a reasonable person at the time of formation would have thought that [section 2(a)] would apply whenever a zoning change for the Premises was allowed or required or a building permit was issued for the development of the Premises – not just for a particular project," such as the project that H&H briefly explored from around 2003 through 2005. Under this interpretation, the court further ruled that the zoning change that occurred in October 2012 was a "sufficient basis" for H&H to terminate the lease and to require Thomas and TAH to engage in renegotiations for a new lease agreement.

We agree with the circuit court, which reached the proper conclusion by employing the proper analysis. In examining the addendum anew, we hold that section 2(a) meant only that the lease would terminate, and that H&H could require Thomas and

-13-

TAH to renegotiate a new lease, when the "appropriate Government officials" either "allow or require" a "zoning change" or issue a building permit.  In this regard, we note that had the parties intended to allow H&H to terminate the lease and require a renegotiation only when the officials allowed or required a change or issued a permit that H&H had requested, as Thomas and TAF contend they did, it would have been easy enough to include limiting language to that effect.  The absence of any such language confirms the correctness of the circuit court's conclusion.  Neither the circuit court nor we are at liberty to revise the agreement to include language that the parties did not themselves include.

Thomas and TAH expend a great deal of effort in detailing their extrinsic evidence of the parties' alleged intentions, but little effort to explain why the final language of the written agreement is ambiguous under the objective approach to contract interpretation. They come closest to an explanation when they argue that the relevant language ("[t]he appropriate Government officials allow or require a zoning change for the Premises, or a building permit is issued for the development of the Premises") involves "active terms" that, they say, signify H&H as the "actor in pursuing such efforts."  Their argument has no linguistic foundation: under the plain language of the clause in question, the "actors" are the "appropriate Government officials," who take the action of "allow[ing] or requir[ing] a zoning change" and by whom any "building permit" would be "issued." Nothing in the relevant language envisions or requires that H&H must take any action at

all.[2]

Thomas and TAH thus fail to proffer any reasonable alternative meaning to the language of section 2(a). Instead, they decry the circuit court's alleged failure to "deal with the meaning of the terms 'allow' and 'require,'" and, even more generally, argue that the court "should have found [section 2(a)] 'susceptible of more than one meaning' and therefore, ambiguous." We are not persuaded: the contractual language was susceptible of only one meaning, the one attributed to it by the circuit court below. To this Court, the use of "allow" and "require" indicates that the triggering zoning change can be the result either of a specific request that is approved by the pertinent government officials or of the government officials' unsolicited exercise of their regulatory authority.

Thomas and TAH also insist that this Court may examine evidence of the parties' subjective intentions because a determination of ambiguity requires courts to consider the "context of the transaction," as well as "the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution." *Calomiris*, 353 Md. at 436. Thomas and TAH have got it wrong. A consideration of the "context of the

---

[2] Although the addendum is not ambiguous on its face, its meaning might conceivably be ambiguous *as applied* in various, hypothetical scenarios. For example, there might be ambiguity about whether a zoning change had been required or approved by an "appropriate" official. Or there might be ambiguity about whether a change was really a "zoning" change, as opposed to some other type of change in the complex scheme of land-use regulation. There might also be an ambiguity about whether a change had really been approved, or whether the approval was merely tentative or preliminary. On the facts of this case, however, none of those ambiguities have arisen.

transaction" and of "the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution" cannot possibly mean that a court may consider extrinsic evidence in order to determine whether an agreement is ambiguous: otherwise, a court could consider extrinsic evidence to determine whether to consider extrinsic evidence, which is absurd. Under Thomas's and TAH's contention, a rule of construction would swallow the parol evidence rule.[3]

We further reject Thomas's and TAH's argument that, even absent any ambiguity, the circuit court nevertheless erred when it interpreted section 2(a) of the addendum without proper regard to the parties' "true" intentions. In essence, Thomas and TAH do no more than ask this Court to arrive at the parties' intentions by considering extrinsic evidence *outside* the scope of the addendum and the lease. "[O]ur task," however, "is to examine the agreement the parties did sign, not the agreement that one or the other now wishes they had negotiated instead." *Newell*, 215 Md. App. at 242. Under the agreement that the parties did sign, the lease terminates, and H&H can require Thomas and TAH to

---

[3] The court considered the "context of the transaction" and "the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution" when it considered the long history of Thomas's leasehold interest in the property, as well as the intra-family dispute concerning the limitations on that interest (*e.g.*, how long the lease would last, when the rent might increase, and whether Thomas could sublease the property). Those "facts and circumstances" are not "extrinsic evidence" for purposes of the parol evidence rule; "extrinsic evidence" is evidence of "prior or contemporaneous agreements or negotiations to vary or contradict a written contractual term." *Calomiris*, 353 Md. at 432 (citing *Equitable Trust Co. v. Imbesi*, 287 Md. 249, 271-72 (1980)).

-16-

renegotiate, when the "appropriate Government officials require or approve a zoning change," regardless of whether H&H initiates the change. Accordingly, the circuit court, correctly concluded that the agreement was unambiguous and correctly declined to use "prior or contemporaneous agreements or negotiations to vary or contradict" the written contractual terms. *Calomiris*, 353 Md. at 432. Those "prior or contemporaneous agreements or negotiations" were discharged upon the execution of the unambiguous addendum. *Id.*[4]

## II. The Circuit Court Correctly Ruled That H&H Could Rely on Section 2(a) in the Future, as There Was a Justiciable Controversy

Even though Thomas and TAH commenced this lawsuit by requesting a declaratory judgment, they argue that the circuit court "exceeded [its] proper role and authority" by declaring the parties' rights and obligations, because, they say, no justiciable controversy was before the court. Thomas and TAH specifically argue that the

---

[4] Thomas and TAH express consternation that the circuit court held the addendum to be unambiguous and excluded the extrinsic evidence after hearing four days of testimony. The court did so, however, only because another circuit judge had previously denied H&H's motion for summary judgment, which the court had the discretion to do even if summary judgment was otherwise appropriate. *Havilah Real Prop. Servs., LLC v. Early*, 216 Md. App. 613, 625 n.12 (2014) (quoting *Dashiell v. Meeks*, 396 Md. 149, 164 (2006)) ("a court 'possess[es] discretion to refuse to pass upon, as well as discretion to affirmatively deny, a summary judgment request in favor of a full hearing on the merits . . . even though the technical requirements for an entry of such a judgment have been met"). In these circumstances, it made sense for the circuit court to allow for the full development of the record before rendering a decision. Of course, the denial of the summary judgment motion did not preclude the court from later determining that H&H was entitled to prevail as a matter of law. *See*, *e.g.*, *Ralkey v. Minnesota Mining & Mfg. Co.*, 63 Md. App. 515, 522-23 (1985).

matter was "unripe," as "the state of facts had not yet accrued when the legal decision in this case was sought and demanded by plaintiffs before the circuit court." Thomas and TAH specifically insist that the court improperly declared that H&H was "not precluded" from relying on section 2(a) after the litigation, "as defendant, H&H, had neither done so, nor was there any certainty that H&H, as lessor, would do so." We hold that the circuit court did not err, as there was a justiciable controversy on this issue.

Under Md. Code (1974, 2013 Repl. Vol.), § 3-409(a)(2) of the Courts and Judicial Proceedings Article, "a court may grant a declaratory judgment or decree in a civil case, if it will serve to terminate the uncertainty or controversy giving rise to the proceeding, and if . . . [a]ntagonistic claims are present between the parties involved which indicate imminent and inevitable litigation[.]" In view of H&H's assertions that Thomas and TAH had breached the lease and were obligated to renegotiate the lease, as well as H&H's contemporaneous threats to repossess the property, there is no serious dispute that antagonistic claims were present and that a declaratory judgment would terminate the controversy. Indeed, the declaratory judgment did terminate the controversy about whether Thomas and TAH had breached the lease by failing to keep the property in a "clean, orderly, and sanitary condition" and whether Thomas and TAH were obligated to renegotiate the lease in response to the demands that H&H made in early 2012.

Thomas's and TAH's complaint is not so much that the court declared the parties' rights as it is that the court declared the parties' rights with respect to events that occurred

during the pendency of the litigation – specifically, the zoning change that occurred in October 2012. We disagree that the circuit court lacked the power to issue that declaration.

The ripeness doctrine prohibits a court from declaring future rights in anticipation of an event that may never happen; thus the doctrine requires a court to desist until the event actually occurs. However, "if a court is satisfied that the 'ripening seeds' of an actual controversy exist, the facts are not too contingent or speculative for declaratory relief." *Boyds Civic Ass'n v. Montgomery Cnty. Council*, 309 Md. 683, 691 (1987). The *Boyds* Court explained that "'ripening seeds' . . . describes a state of facts indicating 'imminent' and 'inevitable' litigation, provided the issue is not settled and stabilized by a tranquilizing declaration." *Id.* (quoting Edwin Borchard, *Declaratory Judgments* 57 (2d ed. 1941)).

Here, the event at issue (the Kensington zoning change) had not yet occurred when H&H first demanded that Thomas and TAH renegotiate, and the zoning change was still in development when Thomas and TAH filed this suit. The parties, however, stipulated that the change had occurred by the time that the circuit court issued its ruling. At that time, the concerns animating the parties had not dissipated. Moreover, according to the interpretation the court had given to section 2(a), it was all but inevitable that further litigation would ensue over whether that provision permitted H&H, in the future, to require renegotiation of the lease.

-19-

In light of the certain continuation of the dispute, and the transformation of the zoning change from a mere contingency to an undeniable reality, it would have been irresponsible for the court not to exercise its authority to declare H&H's future right to require renegotiation of the lease under section 2(a) of the addendum. Because H&H's rights were based on a state of facts that had already accrued and was neither future, contingent, nor uncertain, the circuit court did not err in issuing a declaration on that subject. *Boyds*, 309 Md. at 690.

Accordingly, we affirm the circuit court's ruling on this issue, as it was presented with a justiciable controversy.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANTS.**